**CITY OF ROSEVILLE,
et al., Plaintiffs,**

v.

**Gale A. NORTON, et al., Defendants.**

**No. Civ. A 02–0628(EGS).**

United States District Court,
District of Columbia.

Sept. 11, 2002.

William P. Horn, Birch, Horton, Bittner and Cherot, Washington, DC, for Plaintiffs, Citizens for Safer Communities, City of Rocklin and Roseville.

J. Scott Smith, Angelo, Kilday & Kilduff, Sacramento, CA, for Plaintiffs, Citizens for Safer Communities, City of Rocklin and City of Roseville appearing pro hac vice.

Steven E. Miskinis, Esquire United States Department of Justice, Environ-

ment & Natural Resources Division, Indian Resources Section, Washington, DC, for Defendants, USA, Dept. of Interior, Gale Norton, Neal McCaleb and Ronald M. Jaeger.

Seth P. Waxman, Wilmer Cutler & Pickering, Washington, DC, for Intervenor, The Auburn United Indian Community.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

Plaintiffs are two California municipalities, the City of Roseville and the City of Rocklin, and an association of citizens from these cities and the neighboring City of Lincoln. Plaintiffs oppose the Secretary of Interior's decision to take a 50–acre parcel of land into trust for the intervenor, the United Auburn Indian Community ("UAIC" or "Tribe"). The Tribe intends to build a 200,000 square foot gaming casino on the parcel, which is located in Placer County, California.

Plaintiffs sue the Secretary of Interior ("Secretary"), the Assistant Secretary of Interior, the Director of the Pacific Region of the Department of Interior, the Bureau of Indian Affairs ("BIA") and the United States. They raise numerous claims against the defendants, many of which suggest that the Secretary's decision to take land into trust for the UAIC unconstitutionally infringes on the sovereignty of the State of California. Yet, in essence, this case arises from the complicated process of restoring sovereignty to the Auburn Indians. In recent years, Congress has restored numerous Indian Tribes to federal recognition and, in doing so, has provided for the restoration of lands to these tribes. Thus, the difficult question posed by this case is not one focused on the limits of state sovereignty, but one stemming from the task of defining the scope of this Congressionally mandated restoration of lands to the Auburn Indians.

Pending before the Court are motions to dismiss or, in the alternative, for summary judgment filed by the United States and the Tribe, and plaintiffs' cross motion for summary judgment. Plaintiffs filed a motion for preliminary injunctive relief. However, pursuant to Fed.R.Civ.P. 65(a)(2), and with the consent of the parties, the Court combined consideration of the motion for preliminary injunctive relief with proceedings on the merits.

The Court grants defendants' and intervenor's motions to dismiss all of plaintiffs' claims, with the exception of that claim arising under the National Environmental Policy Act of 1969, 42 U.S.C. § 4332 *et seq.* ("NEPA"). The Court considers plaintiffs' NEPA claim pursuant to Fed.R.Civ.P. 56 and enters summary judgment for the United States and the Tribe, and against plaintiffs, on this claim.

## I. BACKGROUND

### A. The Auburn Indians

In the early 1900s, the United States government acknowledged the existence of a small Indian village located on the outskirts of the City of Auburn, California. The Auburn Band of Indians, at that point, constituted a small community of California Indians who survived the depredations of the 19th century. *See* S.Rep. No. 103–340 (1994). The Band resided outside the City of Auburn, about forty miles northeast of Sacramento. *Id.* The Band's members were drawn from Indian Tribes whose aboriginal territories reached both north and south of Auburn. *Id.*

In 1917, the United States took approximately twenty acres of land into trust for the Auburn Band, and, in 1953, it took another twenty acres in trust for the

Tribe. These forty acres became known as the Auburn Indian Rancheria. *Id.*

In the 1950s and 1960s, federal trust responsibilities for 41 "rancherias" were terminated. *Id.* The Auburn Rancheria was terminated on August 11, 1967, pursuant to the terms of the Rancheria Act of 1958. *Id.* The Rancheria's assets were distributed among its residents and its lands allotted to them. *Id.*

In July 1991, descendants of the Rancheria's residents formed an organization called United Auburn Indian Community of California (hereinafter "UAIC"). *Id.* After unsuccessfully applying for formal recognition with the BIA, the group was recognized by Congress pursuant to the Auburn Indian Restoration Act in 1994. *See* 25 U.S.C. § 1300*l* (a)–(b). The Act restored rights and privileges of the Tribe and its members, and extended to the UAIC and its members the status of a recognized Indian Tribe. *Id.* The Act requires the Secretary of the Interior to consult with the Tribe in order to "establish[ ] a plan for economic development for the Tribe." *Id.* § 1300*l* –1(a)(1). The Act also permits the Secretary to accept certain real property in trust for the benefit of the Tribe. *Id.* § 1300*l* –2.

Ninety percent of the Tribe's 247 members live within ten miles of the old Rancheria, and some fifty members still live on individual fee lands within the Rancheria's boundaries. Decl. of Jessica Tavares in Support of Tribe's Mot. to Intervene, ¶ 4. Jessica Tavares, the Chairperson of the UAIC, recounts conditions of "grinding poverty," in which many of the Tribe's members live. *Id.; see also* S.Rep. No. 103–240.

## B. Proposal to Develop Gaming Facility

In 1997, the UAIC entered into a "collaborative process" with Placer County to locate and develop a site that would be appropriate for Class III gaming. A.R. 1869 (letter from Placer County to the BIA) (May 16, 2000). After considering various alternatives, the parties settled on a 49.21–acre parcel in an unincorporated portion of the County called the Sunset Industrial Area. A.R. 332(EA). This parcel is currently vacant and is zoned as "Industrial Park–Design Corridor." *Id.* The parcel is bounded on three sides by the cities of Roseville, Rocklin and Lincoln, suburbs of Sacramento, California. The parcel is approximately forty miles away from the boundaries of the former Auburn Rancheria.

The Tribe proposed to develop a 200,000 square foot gaming and entertainment facility on the parcel. The facility would include a bingo area, a casino floor with video gaming and card tables, restaurants, bars, an entertainment lounge, and 3,500 on-site parking spaces. A.R. 323. The facility is expected to draw 8,000 visitors a day and to employ approximately 1,100 people. *Id.*

In October 1999, the Tribe entered into a gaming compact with the State of California. A.R. 680–740. The compact permits the Tribe to conduct Class III gaming and requires the Tribe to contribute to the State Revenue Sharing Trust Fund, which assists "non-Compact" Indian Tribes, addresses gambling addiction, and supports state and local agencies affected by tribal gaming. *Id.*[1]

The Tribe's negotiations with Placer County culminated in a January 18, 2000,

---

1. The compact was contingent on the passage of Proposition 1A, a ballot initiative which subsequently amended the state constitution to permit Class III gaming on tribal lands. Cal. Const., Art. IV, § 19 (amended Mar. 17, 2002). The Secretary approved the Tribe's compact on May 5, 2000. A.R. 679 (65 Fed. Reg. 31,189 (May 16, 2000)).

Memorandum of Understanding ("MOU"), in which the County agreed to support the Tribe's application to the Secretary of Interior. The Tribe agreed, among other things, to work within the general and community plans, zoning ordinances and design guidelines that would have applied to a private development, to comply with the California Environmental Quality Act, to reimburse the County for use of public services, and to pay traffic mitigation and improvement fees. A.R. 820–44. A California Superior Court vacated this MOU pending compliance with environmental review procedures under the California Environmental Quality Act. A.R. 200053–63. However, the court subsequently commented that the defect was "technical," and that the MOU was likely the "best environmental alternative." *Diamond Creek Partners, Ltd. v. City of Lincoln,* No. SCV 10659, Order Denying Motion for Award of Attorneys' Fees and Costs (Cal.Super.Ct. Mar. 11, 2002).

## C. Trust Application

On June 25, 1998, the Tribe filed its initial application asking the Secretary to take the parcel into trust so that it could proceed with its plans to develop a casino. The mechanism for seeking approval from the Secretary of Interior is known as a "fee-to-trust" application. Here, the Secretary seeks to take the parcel into trust pursuant to the Auburn Indian Restoration Act, 25 U.S.C. § 1300*l et seq.* However, the Secretary processed the Tribe's fee-to-trust application pursuant to procedures established under the generally applicable provisions of the Indian Restoration Act, 25 U.S.C. § 461 *et seq. See* 25 C.F.R. § 151. The Tribe amended its application on October 6, 1999, and on February 22, 2000. A.R. 778.

Beginning in 1999, the Tribe, with the assistance of Environmental Sciences Associates ("ESA"), prepared an Environmental Assessment ("EA") of the fee-to-trust application. *See* A.R. 321–561. The EA states that the BIA "worked closely with the UAIC and ESA for approximately one year in defining the Proposed Actions, the site conditions and evaluating the potential effects" of the project. A.R. 571(EA). In addition, Mr. David Zweig of ESA attests that the preparation of the EA took more than three years, and involved seven drafts. Intervenor's Opp'n to Mot. for Prelim.Inj., Ex. 2 ¶ 3 (Zweig decl.). He states that he worked closely with individuals from the BIA, including William Allan, the Pacific Region Environmental Protection Specialist for the BIA. *Id.* ¶ 4. The EA for the proposed casino project was released in June 2000, and 25 comments were received in response to it. The BIA published and, together with the UAIC, responded to public comments. *See* A.R. 4564–93.

The BIA adopted the EA prepared by the Tribe and, on June 21, 2000, circulated it to interested parties for comment. In response to concerns raised by various parties, including plaintiffs, the Tribe worked with Placer County to modify the project in order to mitigate the alleged human, environmental and socioeconomic impacts of the proposal. A.R. 4564–93 (Response to Comments). On January 19, 2001, the BIA issued a Finding of No Significant Impact ("FONSI"), concluding that the proposal would have no significant unmitigated environmental impacts. A.R. 310–17; *see* 40 C.F.R. § 1508.13.

On November 28, 2000, the BIA Pacific Regional Office sent notice of the land acquisition application to the State, local governments, surrounding communities, organizations, and concerned individuals seeking comments regarding the potential impact on local tax rolls, governmental services and zoning laws if the application

were approved. A.R. 1268–77. After considering responses to this notice, the Regional Office concluded in February 2001 that the Tribe's voluntary contributions to surrounding communities substantially offset any loss in real property taxes generated from the property, that the other requirements of 25 C.F.R. Pt. 151 had been met, and that the Tribe's application should be granted. A.R. 259, 264; *see also* A.R. 44 (OIGM Mem. (Feb. 5, 2002)).

The Regional Office's recommendation was forwarded to the Office of Indian Gaming Management ("OIGM"), which conducted its own independent review of the proposal, the FONSI and the comments on the application. A.R. 39–50. Two of the documents considered by the OIGM were memoranda, wherein the Interior Department's Associate Solicitor for Indian Affairs concluded that the Tribe's application fell within the "restored lands" exception of Section 20 of IGRA, 25 U.S.C. § 2719(b)(1)(B)(iii). A.R. 74–76 (2002 Op.); A.R. 997–1000 (2000 Op.). OIGM concluded that, in light of the Tribe's lack of a land base, there was a clear need "to generate resources that will enable the Tribe to make its own decisions regarding the future," and that the proposed acquisition, a prerequisite to the Tribe's operation of a Class III gaming facility under IGRA, would "facilitate tribal self-determination and economic development." A.R. 42 (OIGM Mem.).

On February 5, 2002, the OIGM recommended that the Secretary take the land into trust for the Tribe. A.R. 50. The Department of Interior's regulations, 25 C.F.R. § 151.12(b), provide that the Secretary must publish notice of a decision to take land into trust in the Federal Register or in a newspaper serving the affected area, and withhold action for at least 30 days after the notice is published. On February 5, 2002, the Secretary adopted the OIGM recommendation, finding that all applicable laws and regulations had been complied with, and authorized the Regional Director to take the land into trust thirty days after the publication in the Federal Register of a Notice of the Final Agency Determination. A.R. 37–38; 25 C.F.R. § 151.12(b). The requisite notice was published in the Federal Register on March 15, 2002, and authorized the taking of land into trust for the UAIC on April 15, 2002. 67 Fed.Reg. 11,706. However, the Secretary extended that deadline until April 25, 2002, and, later, until July 9, 2002.

**D. Procedural History**

Plaintiffs filed this lawsuit on April 3, 2002, seeking declaratory and injunctive relief. On June 6, 2002, the UAIC filed a motion to intervene, which was granted on July 8, 2002.

The United States intended to accept title to the land on July 9, unless enjoined from doing so. The plaintiffs filed a motion for a preliminary injunction on June 20, 2002, and, on June 27, 2002, the Court ordered additional briefing on plaintiffs' motion and scheduled a hearing on the motion for July 8, 2002. The July 9, 2002 deadline was set by the United States at the request of the UAIC, which contends that it may lose rights to purchase gaming licenses from the State of California if the Tribe does not imminently begin construction of the casino.

At a July 8, 2002 hearing, the United States, with the consent of the Tribe, agreed to delay taking the land into trust until the beginning of September. This agreement permitted the Court to provide the parties with one decision on the merits, as opposed to ruling on the motion for a preliminary injunction, and later deciding the motions for summary judgment. Accordingly, pursuant to Fed.R.Civ.P.

65(a)(2), and without objection from any party, the Court consolidated plaintiffs' motion for preliminary injunctive relief with proceedings on the merits.

Prior to the July 8, 2002 hearing, both the UAIC and the United States had filed motions to dismiss or, in the alternative, for summary judgment. Following the July 8, 2002 hearing, plaintiffs filed a motion to consider their opposition to these motions as their cross motion for summary judgment. The Court granted this motion.

At the July 8, 2002 hearing, plaintiffs indicated that they had objections to the administrative record filed by the government in support of its decision to take the parcel into trust. The Court set a briefing schedule for the parties to formally lodge objections to the administrative record. However, the parties resolved their dispute regarding the administrative record and, pursuant to an appropriate protective order, plaintiffs have been permitted to review documents previously withheld from the record. Accordingly, the Court denies as moot plaintiffs' motion to compel disclosure, which was filed on July 12, 2002, prior to the entry of the stipulated protective order on July 19, 2002.

## II. STANDARD OF REVIEW

The United States and the UAIC have filed motions to dismiss or, in the alternative, for summary judgment. The Court has also granted plaintiffs' motion to treat their opposition memorandum as a cross motion for summary judgment.

The issues raised by the motions to dismiss with respect to all of plaintiffs' claims other than their NEPA claim are questions of law that may be decided without resort to an administrative record. Accordingly, the Court treats the parties' filings as cross motions for summary judgment on plaintiffs' NEPA claim only, and as motions to dismiss and an opposition memorandum to these motions for purposes of plaintiffs' remaining claims.

The Court will not grant a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). Accordingly, upon consideration of a motion to dismiss for failure to state a claim, the Court accepts as true all of the complaint's factual allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *accord Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1102 (D.C.Cir.1985). Plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged." *Kowal,* 16 F.3d at 1276. However, the movant is entitled to judgment if there are no allegations in the complaint which, even if proven would provide a basis for recovery. *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (1987).

Summary judgment should be granted pursuant to Fed.R.Civ.P. 56 only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling upon cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran,* 517 F.2d 66, 67 (2d Cir.1975).

## III. ANALYSIS

Plaintiffs allege that the Secretary's decision to take the 50–acre parcel into trust

violates Section 20 of IGRA, NEPA and several provisions of the United States Constitution, as well as the Equal Footing Doctrine and the California Organic Act. Plaintiffs' complaint also alleges that the Auburn Indian Restoration Act is an unconstitutional delegation of Congressional power, and challenges IGRA and the Tribal–State Compact between UAIC and the State of California as unconstitutional. Plaintiffs, however, failed to defend their constitutional challenges to IGRA and the Tribal–State Compact. Accordingly, the Court treats these claims as conceded.

While the Court finds that plaintiffs' constitutional claims, with the exception of the excessive delegation claim, have little, if any, basis in law, the question of plaintiffs' standing to assert those claims presents a complex jurisdictional prerequisite to the Court's consideration of the merits of those claims. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (rejecting the notion that federal courts may assume jurisdiction for the purpose of deciding the merits of a case). While plaintiffs have standing to bring their IGRA, NEPA and excessive delegation claims, the Court finds that they do not have standing to challenge the Secretary's decision to take the parcel into trust as a violation of the Enclaves Clause, the Statehood Clause, the Equal Footing Doctrine or the Tenth Amendment.

Plaintiffs' excessive delegation claim must fail because the Auburn Indian Restoration Act gives sufficient and intelligible guidance to the Secretary as to which lands may be taken into trust for the UAIC. The Court also finds that the Secretary's proposed actions do not violate Section 20 of IGRA or the requirements of NEPA.

**A. Plaintiffs' Constitutional Claims**

Plaintiffs bring several causes of action which, in their words, serve as "indication[s]" that the Constitution, when taken as a whole, prohibits the federal government from removing land from a state's sovereignty absent the state's consent. Tr., 8/27/02 at 49. However, these claims present novel and troublesome issues of standing. The Court is wary of reaching these standing issues where plaintiffs' underlying constitutional claims are so clearly devoid of merit. Yet, after careful consideration of binding authority, the Court has found no means of avoiding consideration of standing, a requirement that strikes at the very heart of this Court's jurisdiction to hear plaintiffs' claims.

The United States and the Tribe concede that, for purposes of a motion to dismiss, plaintiffs have alleged sufficient grounds to establish constitutional standing. However, the United States and the Tribe argue that prudential standing principles bar this Court from finding that plaintiffs have standing to raise their constitutional claims, with the exception of their claim of excessive delegation. Upon closer examination of the prudential standing doctrines implicated by plaintiffs' claims, the lines between prudential and constitutional standing concerns are not so neatly drawn. In particular, prudential factors, which counsel against permitting plaintiffs to assert "the legal rights or interests of third parties," *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343, are "not completely separable from Art. III's requirement that a plaintiff have a 'sufficiently concrete interest in the outcome of [the] suit to make it a case or controversy.'" *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 955 n. 5, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (quoting *Singleton v.*

*Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)).

Were the Court convinced that the prudential standing and constitutional standing concerns could be easily distinguished, and that plaintiffs have constitutional standing to assert their claims, the Court might be in a position to avoid the difficult standing issues presented by this case. In *Steel Company v. Citizens for a Better Environment,* the Supreme Court suggested that, while "merits questions" may not be decided before "Article III questions," "merits questions" *may* be decided before "statutory standing questions." 523 U.S. 83, 97 n. 2, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The Court raises this distinction between questions of "statutory" standing and Article III standing in the course of distinguishing its previous decision in *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). There, the Court had determined whether a statutory cause of action existed before it considered whether the plaintiffs "came within the 'zone of interests' for which the cause of action was available." 523 U.S. at 97, 118 S.Ct. 1003 (quoting *National Railroad Pass. Corp.,* 414 U.S. at 465 n. 13, 94 S.Ct. 690). Here, the most vexatious standing concerns are raised by the prudential standing principle limiting litigants' ability to assert third-party interests. These prudential concerns are closely tied to the constitutional standing requirement of a particularized injury, and are not properly characterized as "statutory standing questions." Accordingly, the Court is bound to address plaintiffs' standing before considering the merits of their claims.

### 1. Standing

The United States and the Tribe challenge plaintiffs' standing to assert claims under the Enclaves Clause, the Equal Footing Doctrine, the Statehood Clause and the Tenth Amendment. The essence of these four constitutional causes of action is that the State of California's sovereignty will be impinged if the Secretary of Interior is permitted to take land into trust for the UAIC. The United States and the Tribe argue that plaintiffs, a private association and two municipalities with no claim to jurisdiction over the parcel at issue, may not assert the alleged constitutional rights of the State of California under the Enclaves and Statehood Clauses, the Tenth, or the Equal Footing Doctrine. The United States and the Tribe do not challenge plaintiffs' standing to raise their claim that the Auburn Indian Restoration Act is an unconstitutional delegation of authority. Insofar as standing is a jurisdictional prerequisite, the Court first considers plaintiffs' standing to bring their constitutional claims [2] and then evaluates the merits of plaintiffs' claims.

### a. Standing Principles

This Court's jurisdiction to consider plaintiffs' claims is limited by Article III of the United States Constitution, which requires federal courts to consider only actual "cases" and "controversies." U.S. Const., Art. III. An integral piece of this "bedrock requirement," is that a litigant have standing to raise the claims, which she seeks to have adjudicated by the court. 454 U.S. at 471, 102 S.Ct. 752. "The term 'standing' subsumes a blend of constitutional requirements and prudential considerations," which the Court must address before evaluating the merits of plaintiffs'

---

**2.** Plaintiffs' standing to raise their IGRA and NEPA claims is addressed in Sections III.B and III.C of this Memorandum Opinion.

claims. *Id.* "The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention." *Warth v. Seldin,* 422 U.S. 490, 517–18, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

An individual has constitutional standing if (1) she has suffered the "invasion of a legally protected interest which is ... concrete and particularized," and actual or imminent; (2) her injury is "fairly traceable" to the challenged action of the defendant and not the result of independent action by a third party not before the court; and (3) a favorable decision would "likely" redress the injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Courts have developed prudential standing rules, which act as self-imposed limits on the jurisdiction of Article III courts. The Supreme Court has articulated a "set of prudential principles that bear on the question of standing." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). These include: (1) the principle that " 'plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,' " *id.* (citing *Warth,* 422 U.S. at 499, 95 S.Ct. 2197); (2) an avoidance of " 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches," *id.* at 475, 102 S.Ct. 752 (citing *Warth,* 422 U.S. at 499–500, 95 S.Ct. 2197); and (3) a requirement "that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question,' " *id.* (citing *Assoc. of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).

Plaintiff Citizens for Safer Communities is a non-profit mutual benefit corporation incorporated in California and organized to promote policies supporting "state and family oriented community development." Compl. ¶ 16. The majority of the organization's members reside in the Cities of Lincoln, Rocklin and Roseville, California. *Id.* An organization has standing to sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Two plaintiffs, the City of Roseville and the City of Rocklin, are municipalities. The D.C. Circuit has rejected the argument that a city's standing is analogous to an association's standing. *See City of Olmsted Falls, Ohio v. Federal Aviation Admin.,* 292 F.3d 261, 267–68 (D.C.Cir. 2002). In *City of Olmsted Falls,* the Circuit distinguished a municipality's claim of standing from that of an organization:

> The City does not have "members" who voluntarily associated, nor are the interests it seeks to assert here germane to its *purpose.* Rather the City is effectively attempting to assert the alleged interests of its citizens under the doctrine of *parens patriae.* Arguably, this theory of standing is unavailable because a state may not sue the federal government on behalf of its citizens as *parens patriae.*

*Id.* at 268 (emphasis in original). However, the Circuit further observed that a city

has standing when it alleges a harm to itself as a city *qua* city. *Id.* (citing *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658 (D.C.Cir.1996); *City of Lafayette, La. v. SEC,* 481 F.2d 1101, 1103 n. 3 (D.C.Cir. 1973)). Thus, a city has standing where it "allege[s] harm to its own economic interests based on the environmental impacts of [an] approved project." *Id.; cf. Town of Stratford, Connecticut v. Federal Aviation Admin.,* 285 F.3d 84, 89 (D.C.Cir.2002) (finding that the Town of Stratford lacked prudential standing because it failed to show that its claimed economic injury was connected to "any environmental effects caused by the allegedly defective environmental impact statement")*.*

Two prudential standing doctrines are implicated by plaintiffs' claims. First, plaintiffs' allegations that the Secretary's proposed conduct is unconstitutional because it will impede on the State of California's sovereignty raise concerns that plaintiffs are not asserting their own rights under the United States Constitution, but are rather asserting the rights of the State of California. Second, defendants and intervenor suggest that plaintiffs do not fall within the "zone of interests" of the constitutional provisions that plaintiffs allege are violated by the Secretary's decision to take the parcel into trust for the UAIC. *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

#### i. Third–Party Standing

 Precedent of long-standing recognizes a "rule of self-restraint" barring litigants from claiming standing "to vindicate the constitutional rights of some third party." *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). A party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth,* 422

U.S. at 499, 95 S.Ct. 2197. This is true even where a plaintiff has alleged injury sufficient to meet the "case or controversy" requirement of Article III. *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 80, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). That a party may indirectly benefit from asserting the rights of a third party will not suffice to confer standing. *See Warth,* 422 U.S. at 514, 95 S.Ct. 2197 (finding no standing where plaintiffs were harmed indirectly by alleged violation of others' constitutional rights).

The rationale for this rule, as consistently articulated by the Supreme Court, is that courts should avoid adjudicating the rights of parties not before them, rights which the parties "may not wish to assert." *Duke Power,* 438 U.S. at 80, 98 S.Ct. 2620. The prudential rule provides courts with "the assurance that the most effective advocate of the rights at issue is present to champion them." *Id.* at 80, 98 S.Ct. 2620. The rule also " 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy,' ... and it assures the court that the issues before it will be concrete and sharply presented." *Secretary of State of Maryland,* 467 U.S. at 956, 104 S.Ct. 2839 (quoting *United States v. Raines,* 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)).

The third party standing rule aids the Court in guaranteeing that plaintiffs meet Article III's requirement of a particularized injury. "The prudential limitations add to the constitutional minima a healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed, the claim not be an abstract, generalized grievance that the courts are neither well equipped nor well advised to adjudicate." *Secretary of State*

*of Maryland,* 467 U.S. at 955 n. 5, 104 S.Ct. 2839.

The Supreme Court has, however, recognized some circumstances, in which the prohibition on asserting third parties' legal interests may be relaxed or disregarded altogether. In *Powers v. Ohio,* the Supreme Court articulated "three interrelated criteria" for permitting third-party standing: " 'The litigant must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.' " *Miller v. Albright,* 523 U.S. 420, 447, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (O'Connor, J., concurring) (quoting *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)). This third criteria finds its roots in the decision of *Singleton v. Wulff,* where the Court noted that: "If there is some genuine obstacle ... the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent." 428 U.S. at 116, 96 S.Ct. 2868. Thus, the Court has permitted third party standing of litigants against whom a challenged restriction was enforced, where the enforcement also resulted in a violation of a third parties' rights. *See Haitian Refugee Center v. Gracey,* 809 F.2d 794 (D.C.Cir.1987) (citing *Warth,* 422 U.S. at 510, 95 S.Ct. 2197); *see also Singleton,* 428 U.S. at 113, 96 S.Ct. 2868 (doctors who receive payments for their abortion services are "classically adverse" to government as payer); *Sullivan v. Little Hunting Park,* 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Barrows v. Jackson,* 346 U.S. at 255–256, 73 S.Ct. 1031 (1953).

#### ii. "Zone of Interest" Test

The prudential standing doctrine embodied in the "zone of interest" test was first articulated in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Although *Data Processing* considered only claims brought pursuant to the Administrative Procedure Act ("APA"), the decision announced a broad rule recognizing plaintiffs' standing to bring claims "arguably within the zone of interests to be protected or regulated by the statute *or constitutional guarantee* in question." *Id.* (emphasis added).

In *Data Processing,* the Court, by way of illustration, suggested that the "zone of interest" test might be satisfied by "[a] person or a family ... [with] a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause and the Free Exercise Clause." *Id.* at 154, 90 S.Ct. 827. However, this Court has located only one instance in which the Supreme Court has applied the "zone of interest" test to a constitutional claim. *See Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977). In *Boston Stock Exchange,* the Court applied the "zone of interest" test to regional stock exchanges and their individual members, and found that they were within the zone of interests to be protected by the Commerce Clause. *Id.* at 321 n. 3, 97 S.Ct. 599.

*Clarke v. Securities Industry Association* suggests that the "zone of interest" test is less rigid in the APA context than in the context of other statutes or the Constitution. 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). In a lengthy footnote describing the scope and purpose of the "zone of interest" test, the Court commented on the role of the *Boston Stock Exchange* decision in the overall

body of law interpreting the "zone of interest" test:

> The principal cases in which the "zone of interest" test has been applied are those involving claims under the APA, and the test is most usefully understood as a gloss on the meaning of § 702. While inquiries into reviewability or prudential standing in other contexts may bear some resemblance to a "zone of interest" inquiry under the APA, it is not a test of universal application. *Data Processing* speaks of claims "arguably within the zone of interests to be protected or regulated by the statute *or constitutional guarantee in question.*" 397 U.S. at 153, 90 S.Ct. at 829 (emphasis added).... [We] have on one occasion conducted a "zone of interest" inquiry in a case brought under the Commerce Clause, *see Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 320–321, n. 3, 97 S.Ct. 599, 602–603, n. 3, 50 L.Ed.2d 514 (1977). While the decision that there was standing in *Boston Stock Exchange* was undoubtedly correct, the invocation of the "zone of interest" test there should not be taken to mean that the standing inquiry under whatever constitutional or statutory provision a plaintiff asserts is the same as it would be if the "generous review provisions" of the APA apply, *Data Processing*, 397 U.S. at 156, 90 S.Ct. at 831.

*Id.*

While the zone of interest test and concerns about third party standing overlap to a certain extent, each is a "distinct" "aspect" of prudential standing." *American Immigration Lawyers Assoc. v. Reno*, 199 F.3d 1352, 1357 (D.C.Cir.2000). The D.C. Circuit has distinguished the two principles of prudential standing by emphasizing the difference in the relevant inquiry required by these principles: "The zone of interest test looks at the nature of the claims asserted; third party standing focuses on who is asserting the claim and why the holder of the asserted right is not before the court." *Id.* The Circuit further recognized that, to the extent that a plaintiff is able to establish third party standing, it is likely that the third parties' interests will fall within the relevant zone of interests, and the zone of interest test will be met. *Id.*

**b. Plaintiffs' Standing**

Applying these constitutional and prudential standing principles to plaintiffs' claims, the Court finds that plaintiffs have sufficiently alleged Article III standing to bring their constitutional claims. However, plaintiffs lack prudential standing to bring claims under the Enclaves Clause, the Statehood Clause, the Tenth Amendment and the Equal Footing Doctrine because their claims assert interests of the State of California, not those of plaintiffs, where there is no impediment to the State's ability to protect its own interests. Plaintiffs, however, do have standing to assert their claim that the Auburn Indian Restoration Act constitutes an unconstitutional delegation of Congressional power.

"For purposes of ruling on a motion to dismiss for want of standing," the Court must "accept as true all material allegations of the complaint." *Warth*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In order for the Court to consider the merits of plaintiffs' claims, it need only find that one of the three plaintiffs has standing to bring the claims. *Mountain States Legal Fdt'n v. Glickman*, 92 F.3d 1228, 1232 (D.C.Cir.1996) ("For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim."). The Court notes that the parties' submissions draw no distinction between the standing of Citi-

zens for Safer Communities and that of the two plaintiff cities. However, as discussed above, the standing requirements for municipalities are distinct from, and arguably more stringent than, the prerequisites for organizational standing. Therefore, the Court begins its analysis by inquiring whether an individual member of the plaintiff organization, Citizens for Safer Communities, would have standing to bring suit. This is the first criterion of the three-prong test for organizational standing. To the extent that the Court finds that an individual member would not have standing to bring a claim, the Court need not inquire.as to whether the organization meets the additional requirements for organizational standing. However, where the Court finds that the organizational plaintiff does not have standing to bring certain claims, the Court must then also consider whether the municipalities have standing to assert those claims.

### i. Plaintiffs' Standing to Bring Claims under the Enclaves Clause, the Statehood Clause and the Equal Footing Doctrine

■ The United States and the Tribe argue that this Court should apply doctrines of prudential standing to plaintiffs' constitutional claims. Specifically, they contend that plaintiffs do not have standing to bring claims under the Enclaves Clause, Statehood Clause, and the Equal Footing Doctrine because these claims assert the rights of states *qua* states and cannot be brought by third persons. Plaintiffs respond that they have sufficiently alleged Article III standing and that prudential standing limitations should be applied sparingly and with flexibility where, as here, plaintiffs assert constitutional violations.

The Supreme Court has noted that the standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). However, given the favorable standard of review on a motion to dismiss, the Court finds that members of Citizens for Safe Communities have Article III standing to bring claims under the Enclaves Clause, Statehood Clause and Equal Footing doctrine. The organization alleges that its members are injured by the Secretary's conduct because operation of a large scale casino would result in increased crime rates and in economic losses to the surrounding communities. Further, the members' proximity to the proposed casino is sufficient to show that this concrete injury is also particularized. *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. The injury is alleged to be "an invasion of a legally protected interest," *id.*, to the extent that the plaintiffs allege that the defendants' conduct is in contravention of the Enclaves Clause, Statehood Clause and Equal Footing doctrine. The members' injury is likely to be redressed by a favorable ruling on the organization's Enclaves Clause, Statehood Clause and Equal Footing doctrine claims because such a ruling would prevent the United States from taking title to the parcel in question and, consequently, prevent the UAIC from building a casino on the parcel.

While the Court finds that the members' alleged injury is both "an invasion of a legally protected interest" and "concrete and particularized," *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130, the crux of the standing challenge in this case is the contention that the interest invaded is not personal to plaintiff's members. To repeat the oft-quoted language of *Warth v. Seldin*, "the plaintiff generally must assert his own legal rights and interests, and cannot rest

his claim to relief on the legal rights or interests of third parties." 422 U.S. at 499, 95 S.Ct. 2197. Plaintiffs argue that this prudential doctrine should not be applied to their claims because standing requirements are relaxed for constitutional claims. Not only is this argument patently incorrect,[3] but it ignores the degree to which third party standing concerns are intertwined with Article III standing.

This Court is unaware of any case law, and the parties have cited to no case law, discussing a litigant's standing to bring constitutional claims under the Enclaves Clause, the Statehood Clause and the Equal Footing Doctrine, let alone addressing the issue of whether prudential standing doctrines apply to such claims. However, even a cursory review of Supreme Court precedent demonstrates that the Court has consistently applied the third party standing doctrine to litigants' constitutional claims. *See, e.g., Warth,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343; *Heald v. District of Columbia,* 259 U.S. 114, 123, 42 S.Ct. 434, 66 L.Ed. 852 (1922) (plaintiff challenging a statute on constitutional grounds must demonstrate that the unconstitutional nature of the statute injures plaintiff and that the plaintiff is "within the class of persons" with respect to whom the act is unconstitutional).

The United States and the Tribe argue vehemently that plaintiffs are asserting rights on behalf of the State of California, rights which lie exclusively with the State. While the Court recognizes that the Constitution's careful balancing of state and federal interests inures to the protection of individual rights, *see New York v. United States,* 505 U.S. 144, 181, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), this alone is not sufficient to suggest that all constitutional provisions concerning state sovereignty create rights in individual citizens. Nothing in the Enclaves Clause or Statehood Clause suggests the creation of rights or interests held by individuals. Indeed, the clauses, by their terms, recognize rights reserved to the "Legislatures of the States." U.S. Const., Art. I, § 8, cl. 17; *id.* at Art. IV, § 3, cl. 1. Similarly, the Equal Footing Doctrine guarantees to states the fundamental attributes of state sovereignty and that all states are entitled to the same level of sovereignty as is held by the original thirteen states. *Summa Corp. v. California,* 466 U.S. 198, 205, 104 S.Ct. 1751, 80 L.Ed.2d 237 (1984). The interests protected by these clauses, and by the Equal Footing Doctrine, are those of states *qua* states. As such, neither the organization's members, nor the municipalities, have standing to bring claims under the Enclaves Clause, Statehood Clause or Equal Footing Doctrine without some justification that would persuade this Court to set aside the general prudential rule against third party standing.

Here, the "holder" of the constitutional rights, the State of California, is able to defend its interests under the Enclaves and Statehood Clauses and under the Equal Footing Doctrine, should it choose to do so. In *American Immigration Lawyers Association,* the D.C. Circuit noted that the Supreme Court has required that some impediment must exist to the third party's ability to assert her rights or interests, before third-party standing will be permitted. 199 F.3d at 1362 (citing *Powers,* 499 U.S. at 411, 111 S.Ct. 1364). Here, the State is in no way barred from bringing these claims. The State of California is not a party to this matter and, as such, the Court is not inclined to litigate

---

**3.** *See Raines v. Byrd,* 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (calling for "especially rigorous" standing analysis where constitutional challenge brought against executive or congressional branch).

the State's rights. Plaintiffs' claims present a clear example of when third party prudential concerns weigh against permitting plaintiffs to argue claims on behalf of a third party. Because the Court finds that the prudential standing principle limiting third party standing applies to plaintiffs' claims under the Enclaves Clause, Statehood Clause and Equal Footing doctrine, the Court need not reach the "zone of interest" argument advanced by defendants and intervenors.

### ii. Plaintiffs' Standing to Bring a Claim Under the Tenth Amendment

■ In considering plaintiffs' standing to bring their Tenth Amendment claim, the Court must determine whether private individuals have cognizable rights under the Tenth Amendment. Plaintiffs maintain that the Tenth Amendment creates individual rights and, consequently, the third party standing doctrine is inapplicable to plaintiffs' Tenth Amendment claims. Indeed, if plaintiffs are right that the Tenth Amendment creates legally protected interests held by individuals, as well as by the sovereign states, no "third party" problem would exist; plaintiffs would be asserting their own interests.

The case law discussing the private plaintiffs' standing to bring claims under the Tenth Amendment is, at best, unsettled. A recent decision from this Circuit noted that whether private plaintiffs had standing was "uncertain." *Lomont v. O'Neill*, 285 F.3d 9, 13 n. 3 (D.C.Cir.2002). In *Lomont v. O'Neill*, the Circuit held that two plaintiffs, a county sheriff and a chief of a city police department, had standing to raise a commandeering claim under the Tenth Amendment. *Id.* at 13. In holding that these two plaintiffs had standing, the Circuit relied on *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), and *Fraternal Order of Police*

*v. United States*, 173 F.3d 898, 904–05 (D.C.Cir.1999), where law enforcement officers were permitted to bring Tenth Amendment challenges. *Id.* at 13–14.

While *Lomont* declined to reach the issue of whether other private plaintiffs had standing to bring Tenth Amendment claims, it recognized the difficult issue of private parties' standing to proceed with such claims. *Id.* The Circuit noted that the Seventh Circuit has concluded that *New York v. United States*, 505 U.S. at 181, 112 S.Ct. 2408, recognizes the existence of individual rights protected by the Tenth Amendment. *Id.* at 13 n. 3 (citing *Gillespie v. City of Indianapolis*, 185 F.3d 693, 700–03 (7th Cir.1999)). Indeed, in *New York*, the Supreme Court commented that:

> The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals.

505 U.S. at 181, 112 S.Ct. 2408. The Seventh Circuit found this language· to be sufficient evidence that the Tenth Amendment creates legal interests in individuals. 185 F.3d at 703. However, as the D.C. Circuit further noted, in *Tennessee Electric Power Co. v. TVA*, the Supreme Court explicitly "held that the TVA had 'no standing in this suit to raise any question' under the Tenth Amendment.'" 285 F.3d at 13 n. 3 (quoting *Tennessee Electric Power Co. v. TVA*, 306 U.S. 118, 144, 59 S.Ct. 366, 83 L.Ed. 543 (1939)). The Circuit cautioned that the Supreme Court has been adamant that it alone has the "prerogative of overruling its own decisions," even where it may appear that a precedent's reasoning has been rejected in sub-

sequent rulings. *Id.* (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

This Court is bound to apply Circuit precedent. *Lomont* implicitly recognizes that the Seventh Circuit's reasoning in *Gillespie* cannot be squared with *TVA's* holding. *New York* paints a powerful picture of the " 'healthy balance of power between the States and the Federal Government.' " 505 U.S. at 182, 112 S.Ct. 2408 (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)). Nevertheless, New York's holding in no way rests on the finding that the Tenth Amendment protects individuals. It is simply impossible to read *New York's* description of the constitutional framework as an overruling of *TVA.* Accordingly, the Court finds that individual members of the plaintiff organization do not have standing to bring claims under the Tenth Amendment.

The plaintiff municipalities also lack standing to bring claims under the Tenth Amendment. In *TVA,* the Court held that TVA lacked standing to raise claims under the Tenth Amendment "absent the states or their officers." 306 U.S. at 144, 59 S.Ct. 366. Rights under the Tenth Amendment are thus properly raised by the states and their officers, and by them alone. Although *Printz* and similar commandeering cases suggest that an exception may exist for law enforcement personnel, the Court is not prepared to extend this exception to find that the plaintiff municipalities have standing to assert legal interests that lie with the State of California.

The Court need not consider the applicability of the "zone of interest" test to plaintiffs' Tenth Amendment claim, finding as it does that the prudential standing principle limiting third party standing bars plaintiffs from establishing standing to bring their Tenth Amendment claim.

### iii. Plaintiffs' Standing to Bring Their Excessive Delegation Claim

■ The non-delegation doctrine stems from separation of powers concerns that prohibit Congress from delegating its legislative functions to the administrative branch of government without intelligible principles, to which the administrative officers must conform. *Loving v. United States,* 517 U.S. 748, 758–759, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). The Supreme Court has held that any party injured by an agency acting pursuant to an unconstitutional delegation of authority has standing to raise the non-delegation doctrine. *See Bowsher v. Synar,* 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). Indeed, in *Immigration & Naturalization Service v. Chadha,* the Supreme Court rejected the suggestion that only the affected branch of government has standing to raise a separation-of-powers challenge to a statute. 462 U.S. 919, 935–36, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Thus, third party prudential concerns, which raise problems for plaintiffs' standing to bring their other constitutional claims, are not implicated by plaintiffs' claim of excessive delegation.

Defendants and intervenor do not suggest that this claim is barred by the "zone of interests" tests and the Court cannot see that this prudential standing rule has any applicability to plaintiffs' non-delegation claim. In *National Federation of Federal Employees v. United States,* the D.C. Circuit found that a government employees union had standing to challenge the closing and realigning of domestic military bases as in violation of the non-delegation doctrine and separation of powers doctrines. 905 F.2d 400, 402 (D.C.Cir. 1990). The Circuit noted that prudential considerations might apply, but after finding that no third party standing concerns were implicated, held that the union had

standing. *Id.* at 403 n. 3; *see also TO-MAC v. Norton,* 193 F.Supp.2d 182 (2002) (where plaintiffs brought constitutional and administrative challenges to the United States' decision to take land into trust for an Indian tribe, court considered "zone of interest" test only in the context of plaintiffs' administrative claims).

Accordingly, the Court finds that the members of Citizens for Safer Communities have standing to bring their claim that the Auburn Indian Restoration Act constitutes an unconstitutional delegation of Congressional authority. Citizens for Safer Communities, as an organization, has standing to pursue this claim because the participation of individual members is not required for maintenance of this lawsuit, and the interests asserted are germane to the organization's purpose. *See Hunt,* 432 U.S. at 343, 97 S.Ct. 2434.

## c. Substantive Constitutional Claims

Plaintiffs' complaint asserts seven constitutional claims. In plaintiffs' motion for summary judgment, they defend only four of these claims. They argue that the Secretary's decision to take land into trust violates the Enclaves Clause and Statehood Clause of the United States Constitution, the reserved powers of the State of California under the Tenth Amendment to the United States Constitution, and the Equal Footing Doctrine and the California Organic Act. Plaintiffs also claim that the Auburn Indian Restoration Act is an unconstitutional delegation of Congressional power. In addition, plaintiffs' complaint contains claims that the Secretary's decision violates the Ninth Amendment, that

the IGRA is unconstitutional, and that the Tribal–State Compact between UAIC and the State of California is invalid because it violates the Equal Protection Clause of the Fourteenth Amendment. The Court treats these latter claims as conceded, as plaintiffs did not defend them in their motion for summary judgment or at oral argument. Lest doubts persist with respect to plaintiffs' standing to bring their claims under the Enclaves Clause, Statehood Clause, Equal Footing Doctrine and the Tenth Amendment, the Court addresses these claims and finds them devoid of merit. Plaintiffs' claim that the Auburn Indian Restoration Act is an unconstitutional delegation of Congressional authority must also be dismissed.

### i. Enclaves Clause

■■ Plaintiffs assert that the Secretary's acceptance into trust of the land in question violates the Enclaves Clause of the United States Constitution. U.S. Const., Art. I, § 8, cl. 17. The Enclaves Clause requires the consent of a State before the federal government may establish an enclave within a State's territory that is exclusively subject to federal legislative authority.[4] According to plaintiffs, if the United States accepts the parcel in trust on behalf of the UAIC pursuant to the Auburn Indian Restoration Act, the land is effectively removed from the sovereign jurisdiction of the State of California. *See* 25 U.S.C. § 1300*l*–2(c) (recognizing lands taken in trust for UAIC as part of the Tribe's reservation). Plaintiffs further argue that the purpose for which the land is being acquired, to construct a gaming facility, is possible only to the extent that

---

4. In full, the Enclaves Clause authorizes Congress:

> To exercise exclusive Legislation in all Cases whatsoever over such District . . . as may become the seat of the Government of the United States, and to exercise like Au-

> thority . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings. . . .

U.S. Const., Art. I, § 8, cl. 17.

California's anti-gambling laws will no longer apply to the parcel. Thus, plaintiffs suggest that the "resulting deprivation of state and local jurisdiction is so all-encompassing that removal of the land from such state jurisdiction to create an Indian gaming enclave" without state and local government approval would violate the Enclaves Clause. Compl. ¶ 61.

Plaintiffs' summary assertion that the Enclaves Clause stands for the proposition that "before land can be removed from the primary sovereignty of a state, the legislature of the impacted state must grant its consent to such a removal," Opp'n at 38, is simply incorrect. Plaintiffs contend that the Enclaves Clause "demonstrates that the framers intended that the territorial sovereignty of an existing state could not be *reduced* without its consent." *Id.* at 37 (emphasis added). However, in support of this statement, plaintiffs merely cite the text of the Clause, which requires state consent where Congress exercises *exclusive* jurisdiction over lands acquired by the United States. Congress need not exercise exclusive jurisdiction over lands that the United States acquires. Indeed, as plaintiffs explicitly recognize, "the mere acquisition of title by the United States is not sufficient to effectuate a general exclusion of state jurisdiction...." *Id.*

■ To make out a viable claim for violation of the Enclaves Clause, plaintiffs must demonstrate that there will be exclusive federal jurisdiction over the parcel to be taken into trust. Plaintiffs' only authority suggesting that land taken in trust for an Indian tribe may constitute a federal enclave is a quotation from a law review article entitled "A Revisionist History of Indian Country." The article maintains that territories for displaced tribes were located by "mak[ing] new Indian reservations enclaves of exclusive federal jurisdiction." Joseph D. Matal, *A Revisionist*

*History of Indian Country,* 1997 Alaska L.Rev. 283, 295. At oral argument, however, plaintiffs' attorney conceded that, "under the current state of the law," land taken in trust for the Tribe is "not an absolute exclusive Federal enclave...." Tr. at 45. Rather, plaintiffs' attorney suggested that, "while not creating an absolute exclusive Federal jurisdiction," the Secretary's decision to take land into trust "touches upon enclave concerns, if not the specific enclaves clause." Tr. at 46.

There is scarce case law interpreting the Enclaves Clause. However, the Supreme Court, in discussing the Enclaves Clause, has suggested that an Indian reservation represents an example of land owned by the United States that does not constitute a federal enclave. *Surplus Trading Co. v. Cook,* 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930). Furthermore, in the recent Supreme Court decision of *Nevada v. Hicks,* the Supreme Court confirmed that lands held in trust are not subject to the exclusive jurisdiction of the United States. 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). In *Hicks,* the Court noted that "State sovereignty does not end at a reservation's border," and that states have "inherent jurisdiction on reservations." *Id.* at 365, 121 S.Ct. 2304. The Court held that, where state interests are minimal, as with "on-reservation conduct involving only Indians ... state law is generally inapplicable," but where "state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land." *Id.* at 361, 121 S.Ct. 2304. Jurisdiction over Indian lands, therefore, is not exclusive, and requires "an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." *Id.* at 362, 121 S.Ct. 2304; *see also Silas Mason,* 302 U.S. at 210, 58 S.Ct. 233 (noting that the United

States does not exercise "exclusive legislative authority" over lands held in trust for Indians).

Defendants reason that exercise of jurisdiction by multiple entities over Indian lands is inconsistent with the presence of exclusive federal jurisdiction. If the parcel at issue were to be considered a federal enclave, the State would have no regulatory authority over the parcel without congressional allowance. "The cases make clear that the grant of 'exclusive' legislative power to Congress over enclaves that meet the requirements of Art. I, § 8, cl. 17, by its own weight, bars state regulation without congressional action." *Paul v. United States,* 371 U.S. 245, 263, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); *see also Jicarilla Apache Tribe v. United States,* 601 F.2d 1116, 1129 (10th Cir.1979) (although reservation for the Kansas Indians was established under the Enclaves Clause, "today there is no exclusive federal jurisdictional Indian Reservation in the United States"). Yet, the holding in *Hicks* suggests that state regulation over Indian trust lands is impeded only to the extent that it conflicts with federal legislation designed to promote the welfare of Native Americans. 533 U.S. at 365, 121 S.Ct. 2304; *see also United States v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286, 82 L.Ed. 410 (1938).[5] Thus, it is clear that land taken into trust for Indians does not create an exclusive federal enclave. Consequently, the Enclaves Clause is not implicated and no violation of the Clause is presented by the facts of this case.

Even if the taking of land in trust for the UAIC could somehow be construed as the creation of an exclusive federal enclave, the Enclaves Clause is not implicated where federal law preempts conflicting State jurisdiction. In the context of Enclaves Clause challenges to federal legislative authority over federally-owned state lands, the Supreme Court has distinguished between derivative and non-derivative legislative powers. *See Kleppe v. New Mexico,* 426 U.S. 529, 541–42, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). Thus, in *Kleppe,* the Court found "completely beside the point" New Mexico's objection that it had not consented, pursuant to the Enclaves Clause, to legislation prohibiting the State from seizing wild animals on federally-owned public lands in the State. *Id.* at 543, 96 S.Ct. 2285. The Court held that Congress had acted pursuant to its non-derivative "powers under the Property Clause." *Id.* at 542–43, 96 S.Ct. 2285. The Enclaves Clause requirement of state consent is thus irrelevant where the Congressional authority to act stems from some other constitutional source. *See Nevada v. Watkins,* 914 F.2d 1545, 1554 (9th Cir.1990).

Here, the Secretary has acted pursuant to a Congressional delegation of authority. Congress holds exclusive and plenary authority over relations with Indian tribes, which is "drawn both explicitly and implicitly from the Constitution itself." *Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *see also Rice v. Cayetano,* 528 U.S. 495, 529 n. 2, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (Stevens, J., dissenting) (collecting cases recognizing the "plenary power of Congress over the affairs of Native Americans"). Congressional authority to take

---

5. Furthermore, federal law grants California significant jurisdiction over Indian country. In *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207–08, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), the Court recognized that Congress had granted six states, including California, "jurisdiction over specified areas of Indian country within the States . . . ." *Id.* (describing grant of broad criminal jurisdiction and jurisdiction over certain private civil litigation).

land in trust for Indians and to legislate on matters affecting tribes stems from both the Indian Commerce Clause and the United States' treaty obligations. U.S. Const., Art. I, § 8, cl. 3; *Rice*, 528 U.S. at 519–20, 120 S.Ct. 1044.[6]

It is clear that the Congressional authority to take the parcel in trust for the UAIC arises from Constitutional provisions other than the Enclaves Clause. As such, pursuant to *Kleppe*, the United States' acceptance of title to the parcel does not violate the Enclaves Clause.

### ii. Statehood Clause

■ Plaintiffs argue that the inclusion of the parcel in question into a reservation for the UAIC has the purpose and effect of removing the parcel from the State of California's sovereign jurisdiction and creates a "state or quasi-state within the borders of an existing state in violation of the Statehood Clause" of the United States Constitution. Compl. ¶ 64. Here, again, plaintiffs contend that defendants' actions would permit the UAIC to exercise complete sovereign powers over the parcel, powers that would be superior to those of the State of California. Plaintiffs aver that, by removing the gaming parcel from the sovereign jurisdiction of the state, the Secretary effectively creates a state or quasi-state.

The Statehood Clause of the Constitution provides:

New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more State, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of Congress.

U.S. Const., Art. IV, § 3, cl. 1. In *The Federalist No. 43*, James Madison explains that the Statehood Clause was intended to "quiet[ ] the jealousy" of States by assuring them that they would not be partitioned or combined in order to create new states.

Plaintiffs' claim that the Secretary's actions are tantamount to the creation of a new state in violation of the Statehood Clause is wholly unconvincing and unfounded in law. The term "State," as used in Article IV, Section 3, contemplates a political entity that is the *equal* of other existing states. Indeed, in *Coyle v. Smith*, the Supreme Court explained that "[t]he power, [in Article IV, Section 3] is to admit 'new States into *this* Union.' 'This Union' was and is a union of States, equal in power, dignity and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself." 221 U.S. 559, 567, 31 S.Ct. 688, 55 L.Ed. 853 (1911) (emphasis in original).

At oral argument, plaintiffs' counsel conceded that plaintiffs are not arguing that taking land in trust for Indian Tribes constitutes the creation of a state "per se." Tr. at 49. Plaintiffs' counsel further conceded that there is no authority for plaintiffs' argument that taking land in trust would be analogous to the creation of a state. *Id.* Rather, plaintiffs explain, they bring claims under the Statehood Clause and the Enclaves Clause as "an indication" that, when the Constitution is read as a whole, the Court should find that the federal government does not have the author-

---

**6.** At oral argument, plaintiffs for the first time argued that any reliance on non-derivative Congressional authority was unavailing because Congress had exceeded its authority under the Indian Commerce Clause and the Treaty Clause. Because the Court also rejects plaintiffs' excessive delegation arguments, this argument must also fail.

ity to remove land from the sovereignty of a state absent the state's consent. *Id.*

As discussed above, Supreme Court precedent clearly establishes that the creation of an Indian reservation does not negate state sovereignty. *See, e.g., Nevada v. Hicks,* 533 U.S. at 365, 121 S.Ct. 2304. As such, the taking of land into trust for the UAIC in no way creates an entity equal to the State of California, or to the other states in the union. Plaintiffs' claim that the Secretary's conduct violates the Statehood Clause is therefore wholly without merit and must be dismissed.

### iii. Equal Footing Doctrine and the California Organic Act

■ Plaintiffs allege that the defendants' "creation or recreation of a sovereign tribal entity" as a "federal protectorate" for the UAIC within the State of California violates the Equal Footing Doctrine and California's Organic Act, which guarantee to California that it was admitted to the Union on an equal footing with the original thirteen states. Compl. ¶ 70.

■ The Equal Footing Doctrine derives from the Statehood Clause of the Constitution, which the Supreme Court has construed as imposing a duty "not to admit political organizations which are less or greater, or different in dignity or power, from those political entities which constitute the Union." *Coyle,* 221 U.S. at 566, 31 S.Ct. 688. The doctrine "prevents the Federal Government from impairing fundamental attributes of state sovereignty when it admits new States into the Union." *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 203–04, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). Thus, the "Federal Government . . . cannot dispose of a right possessed by the State under the equal-footing doctrine of the United States Constitution." *Summa Corp.,* 466 U.S. at 205, 104 S.Ct. 1751.

Plaintiffs have not alleged that the taking of the parcel in trust for the Tribe will in any way impair the sovereignty of the State of California such that California will no longer be equal to other states in the Union. Nor have plaintiffs alleged that California has been denied any constitutionally guaranteed right by the fact that some state laws may be preempted by federal Indian legislation. The federal government possesses plenary power with respect to Indian affairs. *Morton,* 417 U.S. at 551–52, 94 S.Ct. 2474. The exercise of this plenary power simply does not constitute a violation of the equal footing doctrine.

### iv. Reserved Powers of the State of California and Its Peoples under the Ninth and Tenth Amendments to the United States Constitution

■ Plaintiffs contend that, in the absence of express powers granting the federal government authority to set land aside for the purpose of operating a casino in contravention of state law, taking the parcel into trust would constitute a violation of the reserved powers of the State of California under the Tenth Amendment and the powers reserved to the people, which are generally guaranteed by the Ninth Amendment.

The Tenth Amendment reserves to States all powers not granted to the federal government by the Constitution. U.S. Const.Amend. X. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York,* 505 U.S. at 156, 112 S.Ct. 2408.

As previously discussed, the Supreme Court has recognized Congress' plenary power "to deal with the special problems of

Indians...." *Morton,* 417 U.S. at 551, 94 S.Ct. 2474. This power stems "from the Constitution itself." *Id.* at 552, 94 S.Ct. 2474. Indeed, the Supreme Court has held that neither the fact that an Indian Tribe has been assimilated, nor the fact that there had been a lapse in federal recognition of a tribe, was sufficient to destroy the federal power to handle Indian affairs. *United States v. John,* 437 U.S. 634, 652, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978). Accordingly, the Tenth Amendment does not reserve authority over Indian affairs to the States, and plaintiffs' Tenth Amendment claim is without merit and must be dismissed.

Plaintiffs failed to defend their Ninth Amendment claim in their motion for summary judgment, and it should be treated as conceded. At oral argument, plaintiffs' counsel suggested that the Ninth Amendment claim is part and parcel of plaintiffs' Tenth Amendment claim, yet appeared to concede that the Ninth Amendment claim could be dismissed to the extent that the Court found plaintiffs' Tenth Amendment claim to be without merit. *See* Tr. at 5 ("... I don't argue [the Ninth Amendment claim] as separately cognizable, but it's part of the general limitation of powers.). In any event, this claim is also without merit. The Ninth Amendment acts as a "saving clause" for the Constitution's Bill of Rights. *Richmond Newspapers v. Virginia,* 448 U.S. 555, 579 n. 15, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). In essence, the Ninth Amendment was intended to protect those rights that were not expressly guaranteed in other parts of the Bill of Rights. *See DeMarco v. Cuyahoga County Dep't of Human Servs.,* 12 F.Supp.2d 715, 723 (N.D.Ohio 1998) ("The Ninth Amendment may be invoked, if at all, to protect fundamental rights not set forth in the Constitution."). Here, plaintiffs summarily state that the taking of the parcel into trust would violate the people's Ninth Amendment rights. Yet, they fail to identify any right that has been reserved to individuals or the public, which is violated by the Secretary's decision. Accordingly, plaintiffs' Ninth Amendment claim must be dismissed.

### v. Auburn Indian Restoration Act as an Unconstitutional Delegation of Congressional Power

■ Plaintiffs allege that the Auburn Indian Restoration Act, 25 U.S.C. § 1300*l* –1 *et seq.,* is unconstitutional because it delegates Congressional authority to decide whether to set land aside for the exercise of territorial sovereignty by the UAIC to the executive branch of the federal government without setting any applicable and meaningful standards to guide the Secretary of the Interior in her decision. Plaintiffs contend that the Act's delegation of authority to the Secretary to take lands into trust from anywhere in Placer County is unconstitutional because it "constitutes a total abdication of ... responsibility for such determinations" by Congress. Compl. ¶ 74.

Courts must accord acts of Congress the presumption of constitutionality. *Rust v. Sullivan,* 500 U.S. 173, 190–91, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Congressional authority to legislate derives from Article 1, Section 1 of the U.S. Constitution, which provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const., Art. 1, § 1.

In a delegation challenge, the question presented to the court is whether the Congressional enactment has delegated legislative power to the agency and, if so, if Congress has "lay[ed] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr., &*

*Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928), *quoted in Whitman v. American Trucking Ass'n,* 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001).

In the recent Supreme Court decision of *Whitman v. American Trucking Associations,* plaintiffs contended that Congress had not provided the EPA with sufficiently intelligible criteria by failing to instruct the agency "how much is too much" in determining air quality standards. *Id.* The Court, in rejecting this challenge, noted that it had frequently permitted Congress to defer the setting of specific standards to an agency. *See id.* at 474–75 (collecting cases). The Court noted that only twice in its history had it only found the requisite "intelligible principle" lacking. *Id.* at 474, 121 S.Ct. 903. In one instance, the statute conferred authority to regulate the economy on the basis of a standard of "fair competition," and in the other instance the statute provided absolutely no guidance. *Id.* (citing *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935)).

▉ The power to acquire land in trust for the Indians lies with Congress, and is not an executive power. Thus, Congress is "constitutionally empowered to set the rules and regulations for" land taken in trust for Indians. *Confederated Tribes of Siletz Indians of Oregon v. United States,* 110 F.3d 688, 694 (9th Cir.1997) (citing *Sioux Tribe of Indians v. United States,* 316 U.S. 317, 326, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942)).

Plaintiffs argue that the "only narrowing provision within the Auburn [Indian] Restoration Act is the geographical component," Tr. at 53, and that this alone does not provide sufficient guidance to the Sec-

retary. Plaintiffs rely almost exclusively on an Eighth Circuit decision, which was vacated by the Supreme Court. *See State of South Dakota v. United States Dep't of the Interior,* 69 F.3d 878 (8th Cir.1995). In *State of South Dakota,* the court held that Section 5 of the Indian Restoration Act, which permits the Secretary to acquire land in trust for Indians, was unconstitutional because it provided no legislative standards governing the Secretary's acquisition. As an initial matter, the Court notes that the *State of South Dakota* decision was vacated, albeit on other grounds, and, therefore, has no precedential value. Plaintiffs nevertheless argue that this Court should be swayed by the logic of the Eighth Circuit's opinion. Furthermore, *State of South Dakota* was decided prior to the Supreme Court's decision in *Whitman v. American Trucking Ass'n. See* 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1. Accordingly, while the Court takes note of the *South Dakota* decision, it applies the analytical principles articulated in *American Trucking.*

The Auburn Indian Restoration Act provides limitations on the Secretary's trust-acquisition authority that require that land taken into trust be within a certain geographical area, be free of any adverse legal claims, and further the objectives of the Act. *See* 25 U.S.C. §§ 1300*l* –1, 1300*l* –2(a). Furthermore, the Secretary's ability to accept acreage into trust that lies outside of Placer County, but within the Tribe's service area, is limited by the provisions of the Indian Restoration Act. *Id.* § 1300*l* –2(a).

In *Confederated Tribes of Siletz Indians of Oregon,* the Ninth Circuit rejected a claim that Section 5 of the Indian Restoration Act constituted excessive delegation. 110 F.3d at 698. Section 5 generally permits the Secretary to take land into trust for Indians in order to promote Congres-

sional goals of Indian self-determination and economic self-sufficiency. The court found that, "[b]ecause Congress has given guidelines to the Secretary regarding when land can be taken in trust, the primary responsibility for choosing land to be taken in trust still lies with Congress. The Secretary is not empowered to act outside of the guidelines expressed by Congress." *Id.; see also TOMAC v. Norton,* 193 F.Supp.2d 182, 192 (D.D.C.2002) (noting that "[e]ven the Eight Circuit's *South Dakota* decision recognized acquiring land for new reservations as a legitimate and specific purpose").

The existing limitations on the Secretary's trust-acquisition authority are more than sufficient to provide the requisite "intelligible principles." The Auburn Indian Restoration Act is even more specific in its directives than the broad mandate of Section 5 of the Indian Restoration Act. The Auburn Indian Restoration Act permits the Secretary to take land into trust pursuant to her authority under the Indian Restoration Act, and then further specifies the type of land and geographical location of the land that may be taken into trust. *See* 25 U.S.C. § 1300*l*–2. In addition, the Act sets forth a policy of advancing the economic development of the Tribe. *See id.* § 1300*l*–1. As such, the Court finds that Congress has provided more than sufficient guidance to the Secretary of Interior for use of her authority to take land in trust for the UAIC, and holds that the Auburn Indian Restoration Act does not constitute an unconstitutional delegation of Congressional authority.

### vi. Constitutionality of IGRA

Plaintiffs' eighth cause of action alleges that IGRA is unconstitutional and that, therefore, the approval of the UAIC's trust acquisition application, made pursuant to IGRA, was arbitrary, capricious and contrary to law. Compl. ¶ 76. Plaintiffs ar-

gued that IGRA is unconstitutional because it violates the reserved powers of the several states guaranteed by the Tenth Amendment and requires a violation of state sovereign immunity in violation of the Eleventh Amendment. *Id.* However, plaintiffs failed to defend this claim in their opposition to the motions to dismiss, and conceded the claim at oral argument. Accordingly, the Court dismisses this claim.

### vii. Tribal–State Compact as Violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution

Plaintiffs also fail to defend their claim that the Secretary's approval of the trust acquisition application was arbitrary, capricious and contrary to law because the compact between the UAIC and the State of California violates equal protection principles guaranteed by the Fourteen Amendment. Compl. ¶ 79 (ninth cause of action). The Court, therefore, dismisses this claim.

### B. Plaintiffs' Claim that the Secretary's Decision to Take the Parcel into Trust Violates Section 20 of the Indian Gaming Regulatory Act

Plaintiffs allege that, if the Secretary is permitted to take the parcel in trust for the UAIC, it will constitute a violation of Section 20 of IGRA. Plaintiffs argue that, before the Secretary may take the parcel into trust, two prerequisites of Section 20 must be met: the Secretary must determine that construction of the proposed casino would be in the best interests of the UAIC and "would not be detrimental to the surrounding community," and the Governor of California must concur in this determination. 25 U.S.C. § 2719(b)(1)(A). The United States and the UAIC contend that these requirements do not apply to the UAIC's trust application because the land in question qualifies for an exception

set forth in Section 20 for "the restoration of lands for an Indian tribe that is restored to federal recognition." *Id.* § 2719(b)(1)(A)(iii).

The viability of the parties' arguments turns on questions of statutory interpretation, requiring close consideration of both IGRA, 25 U.S.C. § 2701 *et seq.*, and the Auburn Indian Restoration Act, 25 U.S.C. § 1300*l et seq.* The Court concludes that the only reasonable interpretation of the "restoration" exception is one that encompasses the parcel at issue in this lawsuit.

#### 1. Statutory Scheme

IGRA "provide[s] a [federal] statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). IGRA provides a framework under which a Tribe may, under certain circumstances, conduct a "Class III" gaming operation on tribal land. *See generally Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48–49, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Under IGRA, Class III gaming includes gaming using slot machines, roulette and "banked" card games such as blackjack and poker. 25 U.S.C. § 2703(8).

IGRA requires, among other things, that a gaming operation on tribal land be conducted in conformance with a compact entered into between the Tribe and the State and approved by the Secretary of the Interior. 25 U.S.C. § 2710(d). The operation must be conducted on "Indian lands," defined to include lands "within the limits of any Indian reservation" and lands "title to which is . . . held in trust by the United States for the benefit of any Indian tribe." 25 U.S.C. §§ 2703(4), 2710(d)(1).

Section 20 of IGRA, 25 U.S.C. § 2719, generally prohibits gaming on lands acquired by the Secretary in trust for a Tribe after October 17, 1988 unless the Secretary determines that the gaming establishment "would not be detrimental to the surrounding community" and the governor of the affected state "concurs with the Secretary's determination." 25 U.S.C. § 2719(a), (b)(1). Three types of lands are, however, exempt from these requirements. Section 20(b)(1)(B) exempts:

. . . lands . . . taken as part of . . .

(i) A settlement of a land claim,

(ii) The initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or

(iii) The restoration of lands for an Indian tribe that is restored to federal recognition.

25 U.S.C. § 2719(b)(1)(B). To the extent that land taken in trust falls within one of these three exceptions, the Secretary need not make a determination that a gaming establishment on the land would be in the best interests of the Indian tribe and would not be detrimental to the surrounding community.

#### 2. Standing

■■■ Organizational plaintiff, Citizens for Safer Communities, has sufficiently alleged standing to bring a claim under IGRA. Plaintiffs allege that the Secretary based her decision to take the land in trust in part on a determination that gaming could be permitted on the land without any determination under Section 20(b)(1)(A) of IGRA, 25 U.S.C. § 2719(b)(1)(A). Plaintiffs further allege that the members of Citizens for Safer Communities live in close proximity to the proposed gaming facility, and that the facility will negatively affect their health and security. Plaintiffs further allege that this injury will be redressed by a judicial decision in their favor. *See Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. Absent the applicability of a

statutory exception, the Secretary would be required to make a determination regarding the possible detriment of a gaming facility to the "surrounding community." 25 U.S.C. § 2719(b)(1)(A). Thus, plaintiffs' allegations with respect to the organization's members place the members "within the zone of interests to be protected or regulated by" IGRA. *Data Processing,* 397 U.S. at 153, 90 S.Ct. 827. Citizens for Safer Communities has standing to bring a claim under IGRA because the participation of its individual members is not necessary to the maintenance of the lawsuit, and the interests asserted are germane to the organization's purpose. *See Hunt,* 432 U.S. at 343, 97 S.Ct. 2434.

### 3. Restoration of Lands

■ The Court today must determine whether the United States' intended acceptance of the parcel in trust for the Auburn Indians constitutes a "restoration of lands" for the Auburn Indians under Section 20(b)(1)(B)(iii) of IGRA.

In order to determine whether the parcel in question meets the restoration exception under Section 20(b)(1)(B)(iii), the Court must first determine whether UAIC is a "restored" tribe within the meaning of the provision. The parties do not appear to seriously dispute that the UAIC is a "restored" tribe. While plaintiffs, in their brief, suggested that UAIC was not historically a "tribe," at oral argument, they conceded that the UAIC qualifies as a "restored" tribe for purposes of Section 20. Tr. at 6. The act granting federal recognition to UAIC is entitled the "Auburn Indian Restoration Act," 25 U.S.C. 1300*l*, and

expressly "restore[s]" most rights and privileges the Tribe possessed prior to the termination of recognition under the Rancheria Act (Pub.Law 85–671). *See* 25 U.S.C. 1300*l* (a), (b); *see also TOMAC v. Norton,* 193 F.Supp.2d 182 (D.D.C.2002) (rejecting narrow definition of "restored" tribe that would recognize only tribes losing recognition by federal action). The UAIC clearly satisfies this criterion of the restored lands exception.

■ The more difficult question facing the Court is whether the parcel of land, which the Secretary proposes to take in trust, is part of a "restoration of lands" to the UAIC. The Court's inquiry starts with the plain meaning of the statute. "Where there is no ambiguity in the words there is no room for construction. The case must be a strong one indeed, which would justify a court in departing from the plain meaning of words ... in search of an intention which the words themselves did not suggest." *United States v. Wiltberger,* 18 U.S. 76, 5 Wheat. 76, 95–96, 5 L.Ed. 37 (1820); *see also Morales v. Trans World Airlines,* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (noting that courts should "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.") (internal quotations omitted).

Neither "restored" nor "restoration" is defined in Section 20 or anywhere else in IGRA. *See Sault Ste. Marie,* 78 F.Supp.2d at 706; *Grand Traverse I,* 46 F.Supp.2d at 696. Thus, as have previous courts considering the restored land exception,[7] this

---

7. To date, only five district court opinions, three from the Western District of Michigan and two from this Court, have analyzed the restored lands exception set forth in Section 20. *See Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney for Western Dist. of Mich.,* 198 F.Supp.2d 920 (W.D.Mich.

2002) ("*Grand Traverse II* "); *TOMAC v. Norton,* 193 F.Supp.2d 182, 193–94 (D.D.C.2002); *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt,* 116 F.Supp.2d 155, 163–64 (D.D.C.2000); *Sault Ste. Marie Tribe of Lake Superior v. United States,* 78 F.Supp.2d 699, 706 (W.D.Mich.1999), *re-*

Court turns to general principles of statutory construction to determine the proper meaning of the words. *See Williams v. Taylor,* 529 U.S. 420, 431–32, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000).

Plaintiffs argue that the plain meaning of "restored" lands encompasses only those forty acres that previously comprised the Auburn Rancheria. Tr. at 14. Barring this interpretation, they suggest that the plain meaning of the exception must be read to refer to a similar parcel of land. Tr. at 15 (describing as a "fallback position" the idea that, if the 40 acres previously part of the Rancheria are not available, another similar 40 acres should be designated as restored lands).[8]

Such a definition of "restoration," however, would lead to an absurd result. Plaintiffs' definition would tie Indian Tribes' ability to invoke IGRA's restored land exception to the availability of the tribes' original lands. Yet, Congress, when it enacted IGRA, inevitably understood that some Indian Tribes, once restored to federal recognition, would not be able to "restore" their original tribal lands.

*Cf. Confederated Tribes,* 116 F.Supp.2d at 156 (rejecting narrow interpretation of "restored" lands to pertain only to lands mentioned in an Indian Restoration Act, and not to lands historically held by a Tribe).

The plain meaning of "restore" is clearly broader than the definitions that plaintiffs tender to this Court. In ascertaining the "plain meaning" of the term "restore," the *Grand Traverse I* court turned to the dictionary definition. The principal dictionary definitions of "restore" are:

> 1: to give back (as something lost or taken away): make restitution of: return ... 2: to put or bring back (as into existence or use) .... 3: to bring back or put back into a former or original state....

*Grand Traverse I,* 46 F.Supp.2d at 696 (quoting *Webster's Third New Int'l Dict.,* p. 1936 (G. & C. Merriam Co.1976)). Similarly, the court considered the dictionary definition of "restoration":

> 1: an act of restoring or the condition or fact of being restored: as a: bringing back to or putting back into a former

*manded on other grounds,* 288 F.3d 910 (remanding with instructions to dismiss on grounds of plaintiffs' failure to establish standing at summary judgment stage); *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Atty. for Western Dist. of Mich.,* 46 F.Supp.2d 689 (W.D.Mich.1999) ("*Grand Traverse I*") (ruling on preliminary injunction). However, only *Confederated Tribes* and *Sault Ste. Marie Tribe* analyze the meaning of "restoration of lands." The *Grand Traverse* decisions and *TOMAC* primarily focus on the definition of a "restored" tribe, and not on the parameters of "restored lands." *See Grand Traverse I,* 46 F.Supp.2d at 698–99 (rejecting government's argument that restored land exception is limited to tribes whose recognition was restored by way of Congressional action or by order of the court, not by agency acknowledgment); *TOMAC,* 193 F.Supp.2d at 193 (rejecting argument that a tribe was not "restored" if its federal recognition was not terminated by congressional action).

8. At oral argument, plaintiffs suggested that another "plain meaning" interpretation of "restored lands" would be land "similar ... in character in terms of its proposed use as a principal reservation." The apparent rationale underlying such a definition, if it can be described as such, is that the original 40 acres held by the Rancheria were used as a "reservation," and therefore restored lands should be so used. Plaintiffs rely on *Sac & Fox* for this argument. *See Sac & Fox Nation v. Norton,* 240 F.3d 1250 (10th Cir.2001). However, *Sac & Fox* interpreted a different exception to Section 20—one which exempting lands making up an acknowledged Tribe's "initial reservation." *Id.* at 1264–67. Nothing in the statute's description of restored lands suggests that it should be limited to land used as a reservation.

position or condition: reinstatement, renewal, reestablishment.

*Id.* Thus, "restoration" connotes concepts of restitution and reestablishment.

The Supreme Court has instructed that ambiguities in statutes concerning Indians should be construed in a manner beneficial to the Indians. *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). "The existence of a plausible construction more favorable to the [Indian tribe] must be given preference under principles of statutory construction as applied to statutes addressing Indians and the historic trust position of the United States." 46 F.Supp.2d at 699 (citing *Bryan,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710). While the Court is convinced that the plain meaning of the term "restoration" encompasses the idea of restitution and reinstatement, canons governing construction of statutes concerning Indian affairs simply reinforce this interpretation. Nothing in Section 20 suggests that the "restored" land base must be identical to one previously held by the Indians and, especially where such restoration may not be feasible, the Court will not adopt so narrow a construction of the term "restoration."

The Court therefore concludes that "restoration of lands" refers to lands taken into trust that would make the UAIC whole, or place it in its "former" position. And while the Court now embarks on the task of identifying the proper scope of this "restoration," it cannot avoid noting the irony of the current inquiry. Indian Tribes in California "underwent a catastrophic decline in population following European contact." S.Rep. 103–340 (1994). In the 1850s, actions by the California legislature and a series of Claims Court decisions operated to deprive Indian tribes of any land claims against the Spanish and the tribes' "lands became part of

the public domain." *Id.* A small band of Indians concentrated around Auburn and, in 1917, the United States government decided to recognize their existence as a band, acquiring 20 acres of land in trust for the band, which later grew to a 40–acre land base. *Id.* In 1953, the United States Congress called for the assimilation of Indians and, in 1958, terminated federal trust responsibilities for the Auburn Rancheria. *Id.* Now, the Court must ask what land would constitute "restored" lands to the descendants of the Auburn Indians, whom the United States confined to a 40–acre plot before subsequently disbanding the Rancheria.

However clear the concept of restitution might be, the actual identification of the lands that would meet this definition remains elusive. Therefore, the Court turns to the legislative history of IGRA, and to the Auburn Indian Restoration Act, in an attempt to decipher how Congress intended that the UAIC receive a "restored" land base.

*Grand Traverse* is helpful in interpreting the legislative intent of the "restored lands" exception. In *Grand Traverse I,* a decision that has been uniformly followed by other courts considering the "restored lands" exception, the court described the purpose of the exception as one reflecting Congressional intent to place restored tribes in a position analogous to those tribes that had not been disbanded. 46 F.Supp.2d at 699. Under IGRA, tribes that had not been disbanded have the right to conduct gaming activities on lands which they held prior to October 17, 1988. Thus, only property acquired subsequent to this 1988 date is subject to IGRA's limitations on gaming activities. As such, Indian tribes that were disbanded, and then restored after 1998, were at a disadvantage *vis a vis* those tribes that had not been disbanded and held land prior to

1998. By providing an exception for restored lands of restored Indian groups, Congress intended to provide some sense of parity between tribes that had been disbanded and those that had not. In order to place UAIC on an equal footing with other tribes, Congress intended to provide a land base that would be roughly equivalent to the UAIC's former land base, but which might not be identical.

In attempting to interpret the "restored lands" exception with respect to the UAIC, the Court may also look to the Auburn Indian Restoration Act for guidance. *See United Shoe Workers of America, AFL— CIO v. Bedell*, 506 F.2d 174, 179 (D.C.Cir. 1974) ("When the meaning of a word in a statute is not clear from the language of the statute itself, 'there must be recourse to all the aids available in the process of construction . . . .' "). While Congress did not explicitly incorporate the terms of the Auburn Indian Restoration Act into IGRA, IGRA refers to tribes "restored" to federal recognition, a restoration that was effected through the Act.

The Auburn Indian Restoration Act explicitly authorizes the Secretary to accept land in trust for the UAIC. Section 1300*l*–2 provides:

(a) Lands to be taken in trust

The Secretary may accept any real property located in Placer County, California for the benefit of the tribe if conveyed or otherwise transferred to the Secretary if at the time of such conveyance or transfer there are no adverse legal claims in such property, including outstanding liens, mortgages or taxes owed. The Secretary may accept additional acreage in the tribe's service area pursuant to the Secretary's authority under [the Indian Reorganization Act].

(b) Former trust lands of the Auburn Rancheria

Subject to the conditions specified in this section, real property eligible for trust status under this section shall include fee land held by the White Oak Ridge Association, Indian owned fee land held communally pursuant to the distribution plan prepared and approved by the Bureau of Indian Affairs on August 13, 1959, and Indian owned fee land held by persons listed as distributees or dependent members in such distribution plan or such distributees' or dependent members' Indian Heirs or successors in interest.

(c) [omitted].

25 U.S.C. § 1300*l*–2. The tribe's service area includes not only Placer County, California, but also the counties of Sacramento, Yuba, Nevada, Sutter and El Dorado. 25 U.S.C. § 1200*l*–5. The Act clearly contemplates the creation of a land base for the Tribe. However, the challenge remains of identifying the contemplated land base that should be considered restored lands.

Here, the United States and the Tribe suggest that any land mentioned in the Auburn Indian Restoration Act constitutes restored lands. They rely on an Interior Department legal opinion, which provides: "When Congress specifies or provides concrete guidance as to what lands are to be restored pursuant to the restoration act, they qualify as 'restored lands' under section 20 regardless of the dictionary definition." *See* A.R. 00998 (Interior Dep't Jan. 18, 2000, Legal Op.); *see also TOMAC*, 193 F.Supp.2d at 194 (finding, without discussing rationale, that lands taken into trust pursuant to a tribe's restoration act qualified for "restored lands" exception). Relying on this legal opinion, the United States and the Tribe argue that the fact that lands in Placer County are mentioned in the Auburn Indian Restoration Act is suffi-

cient to characterize those lands as "restored."

As an initial matter, the Court rejects the contention that a legal opinion of the Interior Department is due *Chevron* deference in this Court's interpretation of Section 20. *See Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The legal opinion is not a formal agency regulation and does not have the force of law. *See Christensen v. Harris County*, 529 U.S. 576, 586–87, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Rather, the opinion may be "entitled to respect" under the Supreme Court's decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), but only insofar as the opinion has the "power to persuade." *Id.*

Plaintiffs argue that subsection (b), by its terms, must be read as defining the full extent of any restored lands. Subsection (b) governs the acceptance into trust of "former trust lands of the Auburn Rancheria." 25 U.S.C. § 1300*l*–2(b). It directs the Secretary to take in trust any lands owned in fee by the White Oak Ridge Association, by "distributees," their dependents and successors in interest, or held communally.

However, the Court has determined that "restoration of lands" denotes a restitution to the Tribe of a land base. The Court looks to the Auburn Indian Restoration Act as a guide in determining what lands Congress intended should be considered as lands sufficient to restore the UAIC to its previous position. Subsection (b) can hardly be read as a provision reestablishing a land base for the UAIC.[9]

The clear intent of subsection (a) is to restore a land base to the Tribe, and the Court looks to this subsection to identify the scope of the "restoration of lands" to the UAIC. Plaintiffs argue that to rely on subsection (a) for a definition of restored lands would produce an absurd result, permitting the Secretary to take an unlimited amount of land in trust for the Tribe. In *Sault Ste. Marie Tribe*, the plaintiffs raised the same argument, suggesting that the Secretary could be required to acquire all the land in the named counties on behalf of the Indians. 78 F.Supp.2d at 704. The court rebuffed this argument: "Congress does not appear to be concerned with this possibility, and neither is this Court." *Id.* The court noted that there were practical limits to the Indians' ability to acquire title to property in the counties. Similarly, this Court is not concerned that the UAIC might, as plaintiffs predict, ask the United States to take into trust land located across from the State Capitol, and build a gaming casino there.

In addition, plaintiffs argue that, if all of subsection (a) is taken as a "restoration" clause, the restoration necessarily encompasses land throughout the service area of the Tribe. The Tribe, however, argues for a different interpretation of subsection (a). The Tribe suggests that the second clause of the subsection, which provides that the Secretary may take additional acreage in the Tribe's service area pursuant to the Indian Restoration Act, simply emphasizes that the section should not be read to limit the Secretary's more general authority under the Indian Restoration Act. Such a construction is both logical and persuasive.

One final argument presented by plaintiffs requires brief consideration. Plain-

---

9. The Court need not reach the Tribe's argument that subsection (b) applies only to the Secretary's ability to hold lands in trust in the name of individual members of the Tribe, and not to her ability to accept lands in trust for the Tribe. Subsection (b), by itself, is clearly insufficient to satisfy the Congressional goal of restoring a land base to the Tribe.

tiffs contend that the discretionary nature of the Secretary's authority to take land in trust for the UAIC under subsection (a) weighs against a finding that land taken into trust pursuant to that section are restored lands. Plaintiffs rely in part on *Sault Ste. Marie Tribe,* where the court held that the Secretary's determination that any land accepted pursuant to a mandatory instruction that lands "shall" be taken into trust was "restored" land was reasonable. 78 F.Supp.2d at 702. The court noted that one section of the Little Traverse Restoration Act required the Secretary to accept property for the benefit of the Tribe, while the other provided only that the Secretary "may" accept additional acreage in the Tribe's service area. *Id.*

Plaintiffs suggest that, because subsection (a) contains discretionary language, and subsection (b) contains mandatory language, subsection (b) is properly read as defining the scope of the UAIC's restored lands. They argue that the amendment of subsection (a) in 1996, which replaced the word "shall" with "may," further supports their reading of the statute. Pub.L. 104–122 (1996). However, the Court's inquiry is focused on a reasonable interpretation of the term "restoration of lands," not on the nature of the Secretary's obligation. The Court is not persuaded that the discretionary nature of the Secretary's obligation to take land into trust for the UAIC bears any weight on the Court's consideration of the statute for purposes of determining the proper construction of the phrase "restoration of lands." Congress' intention to grant the Secretary discretion in her decisions to take land into trust for the UAIC in no way undermines the clear Congres-

sional intent to reestablish a land base for the Tribe.

The United States also urges the Court to give deference to the Secretary's decision to take the parcel into trust. The Secretary's decision is based on her review of the Tribe's Application, supporting documentation and public comments on the trust application. As such, the decision may well be due deference under *Chevron.* However, the parties have asked the Court to consider plaintiffs' IGRA claim on a motion to dismiss for failure to state a claim. Plaintiffs' claim that the Secretary's decision violates IGRA rests solely on their contention that the Secretary was obligated to comply with the requirements of Section 20(b)(1)(A).[10] The Court finds that, as a matter of law, a decision by the Secretary to take land into trust for the UAIC that lies within Placer County is subject to the exception set forth in Section 20(b)(1)(B)(iii). This finding does not rest on the vast administrative record underlying the Secretary's decision, and the Court need not determine what deference is due the Secretary's decision to take this parcel into trust for the UAIC.

The plain meaning of IGRA's exception for "lands ... taken into trust as part of ... the restoration of lands for [a restored] Indian tribe" dictates that the Court turn to principles of restitution. In interpreting the scope of this restitution, the Auburn Indian Restoration Act provides persuasive evidence of Congress' intent to restore lands to the Tribe. Congress provided the Secretary with the authority to reestablish a land base for the UAIC by accepting into trust real property located in Placer County, Cali-

---

**10.** Plaintiffs' complaint may be read to include a claim that the Secretary's decision was arbitrary and capricious, irrespective of whether the parcel in question is properly characterized as the "restoration of lands."

*See* Compl. ¶ 53. However, plaintiffs failed to defend this claim in their opposition memorandum or at oral argument, and the Court treats it as conceded.

fornia. Accordingly, the Court holds that the parcel at issue in this case, a 49–acre lot in Placer County, is land taken in trust as part of the restoration of lands for the UAIC. The Court finds that it is likely that the Auburn Indian Restoration Act intended to permit the United States to take in trust, and thus attempt to "restore" to the UAIC, a land base similar to the one that they held previous to their disbandment.

## C. NEPA Violation and Abuse of Discretion by the Secretary of the Interior

Plaintiffs argue that the Secretary of the Interior abused her discretion by failing to consider the negative impacts that the operation of the tribe's casino would have on the surrounding area. Specifically, plaintiffs contend that the Secretary acted arbitrarily and capriciously by relying on the FONSI and the EA in approving the UAIC's request that the United States take title to the parcel in trust for the Tribe.

Plaintiffs contend that the FONSI was arbitrary, capricious and contrary to law because the defendants failed to comply with their obligations under NEPA, the NEPA regulations of the President's Council on Environmental Quality, 40 C.F.R. Pts. 1500–08, Part 516 of the Department of Interior Departmental Manual, the Bureau of Indian Affairs NEPA Handbook, and other relevant federal environmental policy guidance documents. Plaintiffs' main challenge to the EA performed is that it was prepared by the applicant and its consultants. In addition, plaintiffs challenge the substance of the EA, contending that it failed to examine alternatives, was based on undisclosed data and did not sufficiently consider the impact of a casino on rare and endangered species.

NEPA requires that when a federal agency undertakes a major federal action significantly affecting the quality of the human environment, it must prepare a detailed environmental impact statement ("EIS") concerning that action. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11. An EA is conducted for the purpose of determining whether an EIS is required. *See* 40 C.F.R. § 1508.9. "If any 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared before agency action is taken." *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C.Cir.1983). An agency decision that an EIS is not required may be overturned "only if it was arbitrary, capricious or an abuse of discretion." *Sierra Club v. United States Dep't of Transportation*, 753 F.2d 120, 126 (D.C.Cir.1985).

The D.C. Circuit recently described the appropriate standard of review of an agency finding of no significant impact ("FONSI"):

> Under the long-established standard in this circuit, the court reviews an agency's finding of no significant impact to determine whether: First, the agency [has] accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Grand Canyon Trust v. FAA*, 290 F.3d 339, 340–41 (D.C.Cir.2002) (internal citations omitted).

### 1. Standing

 "To be adversely affected within NEPA, [plaintiffs] must at least demonstrate that they can satisfy all constitutional standing requirements and that their particularized injury is to interests of the sort protected by NEPA." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C.Cir.1996) (en banc). The Court reviews plaintiffs' NEPA claim pursuant to Fed.R.Civ.P. 56, insofar as all parties rely on the administrative record to support their arguments with respect to this claim. Upon review of a motion for summary judgment, plaintiffs must assert more than mere allegations to establish standing. Rather, they must demonstrate that they have "raised a genuine issue of fact as to whether an 'agency action' taken ... caused [plaintiffs] to be 'adversely affected or aggrieved ... within the meaning of a relevant statute.'" *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

The D.C. Circuit has recently made clear that, while "geographical proximity does not, in and of itself, confer standing on [a city] under NEPA," such proximity may allow a city to establish NEPA standing by "alleg[ing] harm to its own economic interests based on the environmental impacts of [an] approved project." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267–68 (D.C.Cir.2002). The plaintiff cities here have cited to evidence in the record that suggests that the proposed gaming facility will constitute a drain on the local economy. A.R. 8443. Further, plaintiffs cite traffic analyses in the record that predict an increase in harmful emissions from the increased vehicle traffic likely to be caused by the casino. A.R. 7861. This record evidence is sufficient to raise a genuine issue of fact as to whether the cities' economic interests will be affected by the predicted environmental impact of the project.

The plaintiff organization, Citizens for Safer Communities, also has standing to bring the NEPA claim. Plaintiffs have demonstrated that genuine issues of fact exist as to whether the members are likely to experience predicted environmental effects of the project such as increased noise and pollution due to their close proximity with the project. A.R. 4415, n. 1. The organization itself has standing because the participation of its individual members is not necessary to the maintenance of this lawsuit, and the interests asserted are germane to the organization's purpose. *Id.; see Hunt*, 432 U.S. at 343, 97 S.Ct. 2434.

### 2. Plaintiffs' Procedural Challenges to the Adequacy of the EA

Pursuant to the regulations of the Council on Environmental Quality, 40 C.F.R. § 1506.5(b), an agency may permit an applicant to prepare an EA. However, federal agencies must perform independent reviews of such an EA and must participate actively and significantly in the preparation process. In full, the regulations provide:

(a) Information. If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy.... It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

(b) Environmental assessments. If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of

paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

40 C.F.R. § 1506.5(a), (b). The regulations further provide that, where an EIS, as opposed to an EA, is prepared, it must "be prepared directly by or by a contractor selected by the lead agency." 40 C.F.R. § 1506.5(c). Plaintiffs appear to argue that this requirement applies to the instant case. However, defendants need only comply with subsections (a) and (b), as the UAIC was asked to prepare only an EA, and not an EIS.

The Court finds no grounds to conclude that defendants did not take responsibility for the scope of the EA, or that they did not make an independent evaluation of the environmental impacts of the proposed projects. The declaration of Mr. Zweig describes in detail his work with BIA employees on the EA. *See generally* Zweig decl. In addition, the administrative record contains extensive copies of e-mail communications between the agency staff discussing their comments on, and edits of, the EA. *See, e.g.*, A.R. at 200359–61, 200373–75; *see also* A.R. 4272. The only evidence, to which plaintiffs direct the Court's attention, is an affidavit by plaintiffs' attorney that was included in the administrative record. A.R. 4998. In the affidavit, the attorney asserts that BIA does not possess some of the source materials, which are included in the record. However, in its responses to comments on the draft EA, the BIA explained:

[W]e participated in several site reviews, numerous meetings with the tribe and other parties; EPA, Fish and Wildlife Service, Placer County, the Cities of Lincoln, Roseville and Rocklin among others. We did independently review four administrative versions of the document, providing comments and writing some portions of the document. We did not maintain copies of earlier administrative drafts for the following reasons: maximizing limited storage space when dealing with about twenty-five different projects, avoiding confusion concerning the most current version of the document, and avoiding having our deliberative process second guessed by outside parties using the FOIA process.

A.R. 00615. Plaintiffs fail to point to any evidence in the administrative record that would persuade this Court that the BIA's explanation is unreasonable, or that the agency failed to independently review the submissions of the UAIC and their consultants.

Plaintiffs also contend that the BIA accepted without question the technical content of the EA submitted by the Tribe and its consultants. In particular, they point to the EA's traffic analysis that was based on trip general rates based on data from four other "confidential" casino locations. Plaintiffs argue that the BIA and Department of Interior cannot reasonably accept as accurate the unsubstantiated assumptions and conclusion of the EA that are based on "confidential" data. However, Mr. Zweig's declaration states that, while the data was initially kept confidential in order to protect proprietary interests of the four casinos, the data was released to the public in response to comments on the EA. *See* Zweig decl. ¶ 9. That the names of the casinos involved in the traffic analysis were initially kept confidential simply does not impugn the overall quality of the EA. Plaintiffs fail to raise a genuine issue of fact with respect to the BIA's compliance with the Council on Environmental Quality's regulations.

Plaintiffs also argue that the Department of Interior's NEPA manual prohibits applicants from preparing EAs. However,

in support of this proposition, plaintiffs cite to a provision that applies when a tribal government is not an "applicant," but is merely "affected" by a proposed action, in which case the Tribe "shall be consulted during the preparation of environmental documents." A.R. 4780, *cited in* Opp'n at 54–55. In contrast, the manual provides that, "[w]hen the proposed Bureau action is a response to an externally initiated proposal, ... the applicant will normally be required to prepare the EA, if one is required, and to provide supporting information and analyses as appropriate." A.R. 5935. Accordingly, plaintiffs have failed to demonstrate any factual dispute that might suggest that the EA was procedurally defective.

### 3. Substantive Challenges to Adequacy of the EA

 Plaintiffs make four substantive challenges to the sufficiency of the EA, arguing that it relied on undisclosed data, failed to consider alternatives, does not provide adequate surface water plans, and did not consider the impact of the proposed casino on rare and endangered species. However, plaintiffs are unable to identify any disputed facts that might suggest that the BIA has not "accurately identified the relevant environmental concern" with respect to the issues raised by plaintiffs, or that the agency has not "taken a 'hard look'" at the issues. *Grand Canyon Trust*, 290 F.3d at 341. Furthermore, the Court finds that the BIA has made a convincing case for its finding of no significant impact.

### a. Water Supply

Plaintiffs contend that the BIA failed to take a "hard look" at the water supply in the area of the proposed project. Plaintiffs argue that the EA analyzes only two options for providing a water source for the site: hooking into the Placer County Water Agency, or using groundwater located on the site. In fact, the EA considers *three* options, the third of which is to import water purchased from a public agency or private company, which could be stored in a water tank on the site. *See* A.R. 00338.

No serious issue is raised with respect to the EA's consideration of two of these options. Plaintiffs wholly fail to address the environmental impact of importing water and simply suggest that many "factors" would play into hooking up to Placer County's water supply. Plaintiffs' main argument focuses on the option of drilling an on-site well.

The EA found that the construction of an on-site well would have no significant impact. However, plaintiffs argue that the EA fails to assess the possible impact of constructing such a well on the underlying aquifer and on surrounding wells. Appendix E of the EA is a report describing the availability of groundwater for the project. It does not purport to consider the effects of a well on neighboring wells, which may or may not draw water from the same aquifer. Plaintiffs contend that the appendix fails to consider the possibility of an "overdraft," citing a January 1999 report indicating that Placer County is currently under a "state of overdraft" regarding groundwater consumption. *See* A.R. 07910.

The United States, however, points to a MOU between the Tribe and Placer County that would permit the Tribe to utilize groundwater wells under certain circumstances, thus refuting any concern that the UAIC's use of groundwater would be viewed as unacceptable by the County.[11]

11. Specifically, the MOU provides: "The Tribe shall use its best efforts to obtain sur-

In addition, the EA concludes that the construction of a well, which would require a "continuous 60 gallon per minute draw on the groundwater basin," "would not represent a substantial new demand on the groundwater basin." A.R. at 397. In the response to public comments regarding possible overdraft, the EA notes that several wells in the vicinity of the site are drawing water at 200 to 1,000 gallons per minute. A.R. 04570. The facility's projected water demand would amount to approximately 0.02% of the current groundwater extraction in the region. *Id.* at 04570–71. Thus, the Court cannot conclude that the EA's determination that an on-site well would not have a significant impact on the water supply is inadequately supported by the EA and accompanying materials.

■■■ An agency's decision to rely on some information, and not other, is not a violation of NEPA insofar as that reliance is reasonable. *See Sierra Club v. Watkins,* 808 F.Supp. 852, 862 (D.D.C.1991). Here, the agency clearly considered the information cited to by plaintiffs regarding a potential overdraft, and considered the impact of an on-site well on the aquifer. This Court's review is limited to evaluating whether the agency's action was reasonable. The Court finds that the BIA's conclusions with respect to water supply options are substantiated by a reasoned record.

### b. Wastewater

Plaintiffs also contend that the EA's consideration of alternatives for wastewater disposal are deficient. They note that the EA considered four alternatives, one of which involves a MOU with the City of

Lincoln that was recently voided by the Placer County Superior Court pending compliance with state environmental law. A.R. 0200058. Plaintiffs then argue that the other "two options," construction of an on-site wastewater treatment plant and offsite hauling, would require an EIS. They fail to discuss the existence of the fourth alternative, connecting to Placer County's sewage facilities.

Plaintiffs' argument regarding the possibility of constructing an on-site treatment plant and off-site hauling is simply that these possibilities are "obviously actions that will result in a 'significant' impact on the human environment." Opp'n at 58. Plaintiffs offer absolutely no support for these statements, except to also add that the BIA "ignored flood control issues" that might result from increased discharge into Orchard Creek. Again, this statement is made without any supporting citation to the record.

Indeed, the United States notes that the EA considered the issue of flooding, and found that the proposed treatment plant would add 0.1 cubic feet per second of flow to the creek, and that such an increase would have an insignificant effect on the creek's carrying capacity. A.R. 00396. To the extent that this matter is proceeding on summary judgment grounds, plaintiffs have failed to demonstrate that there is a genuine dispute as to the potential impact of an on-site treatment plant.

Plaintiffs also suggest that the project would "violate policies adopted to protect water quality." Opp'n at 59 (citing to Placer County General Plan, A.R. 6613–14; Sunset Industrial Area Plan, A.R. 06790, 06794–95). However, plaintiffs fail to ex-

---

face water supply for Parcel B through an agreement with either the Placer County Water Agency ("PCWA"), the City of Lincoln or another water district and shall conform to all standard requirements imposed by the water provider. If approval cannot be obtained, the Tribe shall provide water for Parcel B with wells." A.R. 00828.

plain why the project would violate local policies.

Plaintiffs contend that the effect of mercury that may be contained in wastewater effluent was not discussed in the EA. However, a review of the EA shows that the EA did consider the effects of mercury, and that Orchard Creek was sampled for mercury. A.R. 00536, 537 (mercury testing results). The level of mercury in Orchard Creek was found to be "below thresholds identified under current water quality plans." *Id.* Plaintiffs further note that the Delta, where effluent from a wastewater treatment plant would flow, is already listed as an impaired body of water under Section 303(d) of the Clean Water Act, due to "elevated mercury concentrations" found in fish. Opp'n at 58 (citing A.R. 09355–57, Mem. from C. Bunker, City of Lincoln, to J. Pedri, City of Lincoln). Ultimately, plaintiffs do not present evidence to genuinely dispute the EA's finding that the levels of mercury in any wastewater effluent would not have a significant impact are erroneous.

Finally, plaintiffs note that the California Department of Toxic Substances Control passed rules on levels of toxicity exempting Indian Territory from its provisions. Thus, plaintiffs are concerned that a wastewater treatment facility on the site would be exempt from monitoring by the Regional Water Quality Control Board. Opp'n at 58. The EA contains a letter from the California Regional Water Quality Control Board, in which the Board notes that, indeed, pursuant to Regional Board Resolution No. 82–036, waste discharge requirements would be waived for the project. *Id.* Nevertheless, having considered the project, the Board issued a finding that "[n]o significant threat to water quality should result from this activity." A.R. 00518. Plaintiffs have failed to identify any disputed facts that might suggest that the BIA's consideration of wastewater disposal options was unreasonable.

### c. Impact on Endangered and Threatened Species

Plaintiffs claim that the EA "fails to even consider whether the proposed project would significantly impact the endangered and threatened species 'likely to occur in the project site area,'" and maintains that the EA does not list endangered and threatened species actually occurring on the site. Opp'n at 59–60, 60 n. 5. This is simply incorrect. The EA contains a comprehensive, five-page list of "special-status species," which were considered in the evaluation of the project site. *See* A.R. 00364–68. The listing identifies endangered and threatened species, and describes the degree to which each species occurs in the project area. *Id.*

Plaintiffs contend that the EA does not discuss whether the proposed wastewater treatment plant and discharge would affect vernal pool fair shrimp, vernal pool tadpole shrimp, or Boggs Lake hedge-hyssop. Yet, the EA includes at least two appendixes that specifically address the predicted impact of wastewater effluent on aquatic habitats and means of mitigating any adverse impact. *See* Appendixes D, F.

The appendixes demonstrate that the EA authors devoted significant efforts to predicting the impact of the project on endangered and threatened species and on mitigating any such impact. The EA contains correspondence from the "Wetland Consultants," a private firm that recommended that, because the project involves filling potential fair shrimp habitat, consultation with the U.S. Fish and Wildlife Service was required pursuant to Section 7. A.R. 00500–03. The federal defendants consulted with the Fish and Wildlife Ser-

vice to Section 7 on the potential impacts to threatened and endangered species, and adopted mitigation measures recommended by the Service as a condition to its FONSI. *See* A.R. 00402, 493–520. The Fish and Wildlife Service issued a biological opinion regarding the project, which it then amended to reflect changes in the project, including the creation of a buffer zone along the western boundary of the project. This buffer zone serves to separate the project area from the Orchard Creek Conservation Bank and from vernal pools and swales. A.R. 00511. With the buffer zones, the Service concluded that "the overall impact of the proposed project is relatively small (1.63 acres of vernal pools/swales)." *Id.* at 00512.

Plaintiffs also raise the issue of whether mitigation measures proposed by UAIC are consistent with the Placer Legacy program to preserve open space, or whether design of the project will permit full compliance with Placer County General Plan and the Sunset Industrial Area Plan policies intended to protect wetlands, riparian areas and streams. However, they present no support for their "suggestion" that the mitigation measures are either insufficient or inappropriate. Again, plaintiffs have raised no genuinely disputed issue with respect to the reasoning or thoroughness of the BIA's consideration of the potential effect of the gaming facility on endangered and threatened species.

### d. Failure to Consider Alternatives

 The Court will uphold an agency's "discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C.Cir.1991). Plaintiffs argue that the scope of alternatives to be considered in an EA is broader than the requirement for consideration of alternatives in an EIS. Plaintiffs' two primary challenges to the EA's consideration of

alternatives are that the analysis is only six pages, and did not consider two additional alternatives, the "Yuba County" and the "Nyack North" alternatives. However, in addition to the alternatives evaluated in detail in the EA, the EA also considers and rejects for a variety of reasons several other sites. *See* A.R. 00313–14, 00574 (BIA memo discussing alternative site); A.R. 00614–15 (BIA recommendation memo discussing alternative sites); A.R. 00262–63 (BIA memo addressing report outlining alternative site). The fact that the EA may not have considered a specific alternative preferred by plaintiffs is simply not grounds for finding that the agency failed to meet its obligations in preparing the EA, or that the agency's decision was "arbitrary and capricious." *See Citizens Against Burlington*, 938 F.2d at 194.

In short, plaintiffs' substantive and procedural challenges to the EA fall short of the mark. Indeed, it would appear that plaintiffs bring their NEPA claim *despite* the clear import of the NEPA regulations and the contents of the EA prepared in this case. Accordingly, the Court enters summary judgment for defendants and intervenor on plaintiffs' NEPA claim.

### D. Order to Show Cause

The Court is deeply concerned that plaintiffs appear to concede that, in drafting their complaint, they included causes of action as a means of "indicating" more general concepts of constitutional protections of state sovereignty. Plaintiffs' complaint includes separate causes of action for violation of the Statehood Clause, the Enclaves Clause, the Equal Footing Doctrine, and the Tenth and Ninth Amendments. Consequently, the defendants and intervenor, as well as the Court, were obligated to approach each cause of action as a separate alleged violation. Yet, the Court was informed at oral argument that all of

these counts were included to illustrate a general, constitutional requirement that federal action implicating state sovereignty be taken only with the consent of the states. Putting aside any question regarding the merits of plaintiffs' position, the complaint is wholly at odds with plaintiffs' representations at oral argument. Plaintiffs' complaint does not assert a cause of action arising from the violation of a constitutional principle of state sovereignty reflected in various constitutional provisions. Rather, plaintiffs chose to set forth individual allegations of constitutional violations that, it would appear, plaintiffs did not seriously believe had a basis in law. *See* Tr. at 49. The Court is not comforted by plaintiffs' explanation that these allegations were meant as "indications" of constitutional concerns. *Id.*

Further, plaintiffs' counsel conceded that their ninth cause of action, which alleges that the State–Tribal Compact violates the Fourteenth Amendment, was included simply as a security measure. Tr. at 5. Plaintiffs apparently conceded this claim by failing to defend it in their opposition brief, albeit without explicitly notifying the parties or the Court of this concession.

Plaintiffs' litigation strategy is, at best, troubling. When an attorney files a complaint in federal court, she certifies to the Court that the legal arguments contained therein, "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed.R.Civ.P. 11. Yet, here, plaintiffs apparently admit that they intentionally included causes of action in their complaint that they did not believe had a good faith basis in law, but which plaintiffs believed would give rise to judicial consideration of general constitutional concerns. The Court is loathe to condone this fast and loose approach to drafting a complaint. Accordingly, the Court will order plaintiffs to show cause why they should not be sanctioned pursuant to Fed.R.Civ.P. 11 for advancing legal causes of action, which they apparently did not believe were warranted by existing law, and did not intend to defend by arguing for an extension of the law or the establishment of new law.

## CONCLUSION

The Court has carefully considered the parties' motions, the responses and replies thereto, the entire record herein, the oral argument of counsel and the applicable statutory and case law. For the foregoing reasons, the Court enters judgment for defendants and intervenor on plaintiffs' claim that the Secretary has violated NEPA (second cause of action). The Court grants defendants' and intervenor's motions to dismiss plaintiffs' remaining claims with prejudice. The Court holds that plaintiffs do not have standing to assert their claims under the Enclaves Clause, Statehood Clause, Tenth Amendment and Equal Footing Doctrine and, lest doubts persist, that plaintiffs have failed to state claims upon which relief may be granted pursuant to these constitutional provisions. Plaintiffs have sufficiently alleged standing to proceed with their claims that the Secretary has violated Section 20 of IGRA and that the Indian Auburn Restoration Act constitutes an unconstitutional delegation of Congressional authority. However, these claims must be dismissed because they fail to state claims upon which relief may be granted.

An appropriate Order and Judgment was entered on the docket on September 9, 2002.

172

## *ORDER AND JUDGMENT*

Pursuant to Federal Rule of Civil Procedure 65(a)(2), and without objection from any party, the Court consolidated plaintiffs' motion for preliminary injunctive relief with proceedings on the merits. For the reasons stated in open court on September 9, 2002, and upon careful consideration of the defendants' and intervenor's motions to dismiss or, in the alternative, for summary judgment, and the plaintiffs' motion for summary judgment, the responses and replies thereto, supplemental briefing by the parties, oral argument by the parties, the entire record herein, and the applicable statutory and case law, it is hereby

**ORDERED** that defendants' and intervenor's motion to dismiss is **GRANTED in part** with respect to plaintiffs' first, third, fourth, fifth, sixth, seventh, eighth and ninth causes of action; and it is

**FURTHER ORDERED** that defendants' and intervenor's motion for summary judgment is **GRANTED in part** with respect to plaintiffs' second cause of action; and it is

**FURTHER ORDERED** that plaintiffs' claims set forth in their first, third, fourth, fifth, sixth, seventh, eighth and ninth causes of action are **DISMISSED with prejudice;** and it is

**FURTHER ORDERED** that plaintiffs' motion for summary judgment in **DENIED;** and it is

**FURTHER ORDERED** and **ADJUDGED** that the Clerk shall enter final judgment for defendants and intervenor, and against the plaintiffs, on plaintiffs' second cause of action; and it is

**FURTHER ORDERED** that plaintiff's tenth cause of action, which seeks preliminary injunctive relief, is **DENIED** as moot; and it is

**FURTHER ORDERED** that the Court *sua sponte* stays this Order and Judgment until **September 11, 2002** at **12:00 p.m.**

A Memorandum Opinion will follow.

**IT IS SO ORDERED.**